# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RANDY ETHAN HALPRIN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 3:19-CV-1203 |
| | § | |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | CASE INVOLVING THE DEATH |
| Correctional Institutions Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## SUPPORTED BY POINTS AND AUTHORITIES

MAUREEN FRANCO
Federal Public Defender
Western District of Texas

TIVON SCHARDL
Chief, Capital Habeas Unit
Florida Bar No. 73016
TIMOTHY GUMKOWSKI
Assistant Federal Defender
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org
Tim_gumkowski@fd.org

PAUL E. MANSUR
Texas Bar No. 24053310
P.O. Box 1300
Denver City, Texas 79323
(806) 592-2797 (tel.)
(806) 592-9136 (fax)
paul@paulmansurlaw.com

Counsel for Randy Ethan Halprin

## TABLE OF CONTENTS

TABLE OF EXHIBITS ...................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... vi

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 3

   A. Randy Halprin's Crime and Judge Vickers Cunningham's Appointment ................... 3

   B. Mr. Halprin's Trial ................................................................................ 6

   C. Judge Cunningham's Extensive History of Prejudice on the Basis of Religion, Race, Ethnicity, and Sexuality ...................................................... 11

   D. Judge Cunningham's 2006 Campaign for District Attorney ...................... 12

   E. Judge Cunningham's 2018 Campaign for County Commissioner and the May 18, 2018 *Dallas Morning News* Exposé ....................................... 16

JURISDICTIONAL ALLEGATIONS ............................................................... 19

GROUND FOR RELIEF ................................................................................... 21

CLAIM 1.   Trial Judge Vickers Cunningham's Bias Against Defendant Randy Halprin Because He Is Jewish Violated Mr. Halprin's Fourteenth Amendment Right to Due Process of Law. .................................... 21

   A. Legal Standard ..................................................................................... 21

   B. Judge Cunningham's Animus Against Mr. Halprin as a Jewish Person Introduced an Objectively Intolerable Risk of Bias into Mr. Halprin's Capital Trial. ......................................................................................... 26

      1. Judge Cunningham's Prejudiced Comments About Mr. Halprin ....... 26

      2. In Light of All the Facts and Circumstances, an Objective Observer Would Find the Risk of Bias Intolerably High ................................. 33

PROCEDURAL ISSUES .................................................................................. 38

I.   Statement of Exhaustion and Stay Pending Supreme Court Review ................ 38

II.   The Petition Is Timely ............................................................................. 41

III.   The Petition Is Not a "Second or Successive" Petition ............................... 43

   A. Supreme Court Precedent Forecloses Automatically Treating this Petition as "Second or Successive." ................................................................... 45

   B. Dismissing Mr. Halprin's Judicial Bias Claim Would Have Far-Reaching and Perverse Implications .......................................................................... 48

   C. Equity Provides the Appropriate Remedy ................................................ 52

REQUEST FOR PROCEDURES AVAILABLE UNDER STATUTES & RULES ...... 55

PRAYER FOR RELIEF ...................................................................................................... 56

VERIFICATION BY ATTORNEY .....................................................................................

CERTIFICATE OF SERVICE .............................................................................................

# TABLE OF EXHIBITS

| Exhibit # | TITLE OF DOCUMENT | Appendix Page |
|---|---|---|
| 1 | Miles Moffeit, *Chaplain: Escapees tricked guards; Senior minister says workers at Connally prison were beaten viciously, bound and locked up*, Ft. Worth Star-Telegram, Jan. 7, 2001. | 001 |
| 2 | Michael Janofsky, *Texas Fugitives Fit In at Trailer Park, Neighbors Say*, N.Y. Times, Jan. 24, 2001. | 006 |
| 3 | Todd Bensman, *Rodriguez invited into plot for getaway car, Halprin says*, Dallas Morning News, Feb. 4, 2001. | 009 |
| 4 | Brook Egerton, *Halprin endured abuse, other hardships as youth*, Dallas Morning News, Jan. 14, 2001. | 011 |
| 5 | Press Release, *Office of Governor Appoints Cunningham as Judge*, 283rd Judicial District, Oct. 11, 2001. | 015 |
| 6 | Press Release, *Governor Announces Appointment of Francis as a Justice of the 5th Court of Appeals*, Office of the Governor, Sept. 5, 2001. | 016 |
| 7 | Holly Becka, *New judge ready for escapees' trials; Appointee will take over death-penalty cases next month*, Dallas Morning News, Oct. 12, 2011. | 017 |
| 8 | *Two Woodrow Wilson Grads Help Decide the Texas 7's Fate*, Advocate: Lakewood/East Dallas, Aug. 1, 2002. (https://lakewood.advocatemag.com/2002/08/01/men-of-the-law/) | 019 |
| 9 | Declaration of Tammy McKinney | 021 |
| 10 | Rep. Jeb Hensarling, *Honoring the late Bill 'Bulldog' Cunningham*, The Constituent Register, May 16, 2016. (https://the-constituent.com/honoring-mr-bill-bulldog-cunningham-by-representative-jeb-hensarling/speech/69756) | 026 |
| 11 | Jim Jones and Mary McKee, *Baptists eulogize Criswell ministry*, Ft. Worth Star-Telegram, Jan. 17, 2002. | 029 |
| 12 | Gromer, Jeffers, *The late Henry Wade Stirs Emotions of DA Candidates*, Dallas Morning News, Jan. 24, 2006. | 034 |

| 13 | Mark Donald, *Life After Lotto; Whatever Happened to the Dallas Public Defenders Who Won the Lottery?*, Texas Lawyer (online), July 19, 2004. | 037 |
| 14 | Jacquielynn Floyd, *We Shouldn't Be Dulled to the Brutality*, Dallas Morning News, June 10, 2003. | 042 |
| 15 | Robert Tharp, *Jury in escapee trial is still out; Panel sequestered after 5 hours, no agreement on killer's punishment*, Dallas Morning News, June 12, 2003. | 045 |
| 16 | Editorial, *Dallas District Attorney: Cunningham offers GOP a breath of fresh air*, Dallas Morning News, Jan. 21, 2006. | 047 |
| 17 | Declaration of Ms. Amanda Tackett | 049 |
| 18 | Gromer Jeffers, *DA race reflects changing county: Gradual uptick in Democratic support alters campaign tactics*, Dallas Morning News, Feb. 12, 2006. | 054 |
| 19 | Declaration of Mr. Michael Samuels | 058 |
| 20 | "You Know Judge Vic (Ret.)," Judge Vic for Commissioner, http://judgevicforcommissioner.com/about/ (cached May 23, 2018). | 060 |
| 21 | Naomi Martin, *White, straight, and Christian: Dallas County candidate admits rewarding his kids if they marry within race*, Dallas Morning News, May 18, 2018. | 064 |
| 22 | Naomi Martin, *White, straight, and Christian: Dallas County candidate admits rewarding his kids if they marry within race*, Dallas Morning News, May 18, 2018. (Video Interview) (https://www.dallasnews.com/news/dallascounty/2018/05/18/marry-white-straight-christian-dallas-county-politician-admits-rewarding-kids-within-traditional-family-values) | 075 |
| 23 | Editorial, *We withdraw Vickers Cunningham recommendation in GOP runoff for Dallas County Commissioners Court Precinct 2*, Dallas Morning News, May 19, 2018. | 076 |
| 24 | Naomi Martin, *Dallas County GOP slams one of its own candidates for alleged 'racist language and behavior*, Dallas Morning News, May 19, 2018. | 078 |
| 25 | "A Personal Note from Judge Vic Cunningham," (http://judgevicforcommissioner.com/about/ (cached May 23, 2018)). | 081 |

26      Naomi Martin, *Dallas candidate who promised to reward kids for*          106
        *marrying white loses by 25 votes*, Dallas Morning News, May 22, 2018.

27      Report of Professor Bryan Stone, Ph.D                                      111

28      Professor Bryan Stone, Ph.D *Curriculum Vita*                              134

29      Liberally Lean from the Land of Dairy Queen, Feb. 21, 2006,                142
        (www.liberallylean.com/2006/02/pleeeeaaaazzzze)

30      Twitter Comments to Dallas Morning News Tweet of May 18 Article            146

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986)................................................................23

*Amadeo v. Zant*, 486 U.S. 214 (1988)....................................................................................53

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ....................................................................22, 45

*Banks v. Dretke*, 540 U.S. 668 (2004)..............................................................................47, 54

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687 (1994) ......................25

*Beck v. Alabama*, 447 U.S. 625 (1980) ..................................................................................56

*Bracy v. Gramley*, 520 U.S. 899 (1997) .......................................................... 30, 43, 47, 55

*Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858 (5th Cir. 1993) ..........................27

*Buck v. Davis*, 137 S. Ct. 759 (2017).............................................................................passim

*Buntion v. Quarterman*, 524 F.3d 664 (5th Cir. 2008) ....................................................1, 22

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ...............................................21, 23

*Castro v. United States*, 540 U.S. 375 (2007).........................................................................45

*Chapman v. California*, 386 U.S. 18 (1967)...........................................................................48

*Christeson v. Roper*, 135 S. Ct. 891 (2015) ...........................................................................48

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...............24

*Davila v. Davis*, 137 S. Ct. 2058 (2017)................................................................................53

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) .................................................................................24

*De Leon v. Aguilar*, 127 S.W.3d 1 (Tex. Crim. App. 2004)...................................................29

*Edwards v. Balisok*, 520 U.S. 641 (1997)...............................................................................22

*Ex parte Guzmon*, 730 S.W.2d 724 (Tex. Crim. App. 1987)..................................................27

*Felker v. Turpin*, 518 U.S. 651 (1996)..............................................................................43, 52

*Ford v. Wainwright*, 477 U.S. 399 (1986). ................................................................ 44, 47, 49

*Gallow v. Cooper*, 570 U.S. 933 (June 27, 2013) ..................................................................56

*Gregg v. Georgia*, 428 U.S. 153 (1976) .................................................................................25

*Halprin v. Davis*, 911 F.3d 247 (5th Cir. 2018) ....................................................................20

*Harbison v. Bell*, 556 U.S. 180 (2009) ..................................................................................40

*Holland v. Florida*, 560 U.S. 631 (2010) ..............................................................................52

*In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019) ..................................................................25

*In re Complaint of Judicial Misconduct*, 751 F.3d 611 (U.S. Comm. on Judicial Conduct and
    Disability 2014) .................................................................................................................35

*In re Eakin*, 150 A.3d 1042  (Pa. Ct. Jud. Disc. 2016) ..........................................................35

*In re Hearn*, 389 F.3d 122 (5th Cir. 2004)............................................................................40

*In re Lewis*, 484 F.3d 793 (5th Cir. 2004).............................................................................39

*In re Murchison*, 349 U.S. 133 (1955) ...................................................................... 21, 22, 34

*In re Stevens*, 645 P.2d 99 (Cal. 1982) ..................................................................................35

*In re Wilson*, 442 F.3d 872 (5th Cir. 2006)............................................................................40

*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) .........................................................................56

*Kunkle v. Dretke*, 543 U.S. 835 (Oct. 4, 2004) .....................................................................38

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................................................23

*Lonchar v. Thomas*, 517 U.S. 314 (1996)..............................................................................55

*Loving v. Virginia*, 388 U.S. 1 (1967) ...................................................................................31

*Magwood v. Patterson*, 561 U.S. 320 (2010)..........................................................................43

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) .....................................................................23

*Martinez v. Ryan*, 566 U.S. 1 (2013) .....................................................................................53

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018)...............24

*Mathis v. Thaler*, 616 F.3d 461 (5th Cir. 2010) ...................................................................39

*McClenan v. State*, 661 S.W.2d 108 (Tex. Crim. App. 1983) ..............................................29

*McClesky v. Zant*, 499 U.S. 467 (1991) .......................................................................52, 53

*McFarland v. Scott*, 512 U.S. 849  (1994) ........................................................................48

*Moss v. Sanger*, 12 S.W. 619 (Tex. 1889) .......................................................................23

*Murphy v. Collier*, No. 18A985, 2019 WL 2078111 (U.S. May 13, 2019) ....................25

*Norris v. United States*, 820 F.3d 1261 (11th Cir. 2016)....................................................22

*O'Dell v. Netherland*, 521 U.S. 151 (1997) ......................................................................48

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005).................................................................2, 38

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ...............................................................passim

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017).....................................................24, 34

*Penry v. Lynaugh*, 392 U.S. 302 (1989) ...........................................................................26

*Reed v. Ross*, 468 U.S. 1 (1984) .......................................................................................53

*Rhines v. Weber*, 544 U.S. 269 (2005) ....................................................................2, 38, 45

*Rippo v. Baker*, 137 S. Ct. 905 (2017) ..............................................................................21

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018).................................................51

*Rose v. Mitchell*, 443 U.S. 545 (1979) ..............................................................................24

*Sanders v. United States*, 473 U.S. 1 (1963) .....................................................................53

*Schlup v. Delo*, 513 U.S. 298 (1995).................................................................................56

*Schriro v. Landrigan*, 550 U.S. 465 (2007) .....................................................................56

*Starr v. United States*, 153 U.S. 614 (1894) .....................................................................22

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998) ....................................................2, 43

*Strickland v. Washington*, 466 U.S. 668 (1984)...............................................................49

*Strickler v. Green*, 527 U.S. 263 (1999) .....................................................................47, 54

*Teague v. Lane*, 489 U.S. 288 (1989)................................................................................48

*Town of Greece v. Galloway*, 572 U.S. 565 (2014) .........................................................23

*Townsend v. Sain*, 372 U.S. 293 (1963)............................................................................56

*Trevino v. Thaler*, 569 U.S. 413 (2013)............................................................................56

*Tumey v. Ohio*, 273 U.S. 510 (1927)...................................................................21, 22, 44

*Turner v. Murray*, 476 U.S. 28 (1986) .............................................................................50

*Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239 (5th Cir. 1993)............................27

*United States v. Brown*, 539 F.2d 467 (5th Cir. 1976) ................................................22, 34

*United States v. Conforte*, 624 F.2d 869 (9th Cir. 1980)..................................................25

*Walker v. Johnston*, 312 U.S. 275 (1941)..........................................................................55

*Ward v. Vill. of Monroeville*, 409 U.S. 57 (1972) ............................................................23

*Wellons v. Hall*, 558 U.S. 220 (2010) ..............................................................................56

*Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) .....................................................21, 22

*Withrow v. Larkin*, 421 U.S. 35 (1975) ............................................................................42

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .....................................................25, 26

## Constitutional and Statutory Provisions

U.S. Const. amend. I...........................................................................................................23

U.S. Const. amend. XIV...............................................................................................21, 23

18 U.S.C. § 3599(e)............................................................................................................40

28 U.S.C. § 2244(b) ....................................................................................................passim

28 U.S.C. § 2244(b)(2) ......................................................................................................53

28 U.S.C. § 2244(b)(2)(B)..............................................................................................48
28 U.S.C. § 2244(b)(2)(B)(ii)..........................................................................................44
28 U.S.C. § 2244(d)(1)..........................................................................................2, 38, 41
28 U.S.C. § 2244(d)(2)..............................................................................................39, 43
28 U.S.C. § 2248............................................................................................................55
28 U.S.C. § 2254.......................................................................................................passim
28 U.S.C. § 2254(b)........................................................................................................44
28 U.S.C. § 2254(b)(1)..............................................................................................2, 43
28 U.S.C. § 2254(b)(1)(B)(i)....................................................................................39, 44
28 U.S.C. § 2254(d)........................................................................................................56
28 U.S.C. § 2254(d)(1)..................................................................................................56
28 U.S.C. § 2254(d)(2)..................................................................................................56
Tex. Code Crim. Proc. art. 37.071....................................................................7, 10
Tex. Code Crim. Proc. art. 37.071, § 2(e)....................................................................9
Tex. Code Crim. Proc. art. 37.071, § 2(b)(2) ...........................................................7, 10
Tex. Code Crim. Proc. art. 11.071, § 5.............................................................38, 39, 40
Tex. Penal Code § 7.02 ....................................................................................................7

Other Authorities

Antonin Scalia, *God's Justice and Ours: the Morality of Judicial Participation in the Death Penalty, in Religion and the Death Penalty: A Call for Reckoning* (Owens, et al., eds., 2004)................................................................................................................30
Dennis Prager & Joseph Telushkin, *Why the Jews? The Reason for Antisemitism* (1985) ...............................................................................................................1, 24, 29
Henry Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142 (1970) .........................................................................48, 49
Josh Bowers & Paul Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*, 47 Wake Forest L. Rev. 211 (2012) ..................................................................................................................51
Justin D. Levinson, Hon. Mark Bennett & Koichi Hioki, *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63 (2017) .............................37
Justin D. Levinson, Robert J. Smith, Danielle Young, *Devaluing Death*, 89 N.Y.U. L. Rev. 513 (2014) .......................................................................................................37
48B Robert Schuwerk & Lillian Hardwick, *Texas Practice Series: Handbook of Texas Lawyer and Judicial Ethics* § 40:44 .........................................................................29

Rules

Fed. R. Civ. P. 60(b)..................................................................................................2, 55
Rule 6, Rules Governing § 2254 Cases in the District Courts..................................55, 56
Rule 7, Rules Governing § 2254 Cases in the District Courts..................................55, 56
Rule 8(a), Rules Governing § 2254 Cases in the District Courts .................................55
Tex. Civ. R. 18b(a)........................................................................................................29

## INTRODUCTION

The Honorable Vickers Cunningham, the presiding judge at Mr. Halprin's capital trial, is a racist and anti-Semitic bigot who described Mr. Halprin as "that fuckin' Jew" and a "goddamn kike." That judge—who decided all pretrial motions, challenges during jury selection, and all objections during the taking of evidence—believed that Jews "needed to be shut down because they controlled all the money and all the power." He referred to the Latino defendants as "wetbacks." In general, Judge Cunningham said about his service on the bench, "any 'nigger' or 'wetback' walking into his courtroom knew they were going to go down." Judge Cunningham's prejudices, bias, and animus towards Jews precluded him from the being the impartial judge the Due Process Clause of the Constitution requires. His central role in the trial from start to finish constitutes a structural defect, and requires that the judgment of conviction and sentence of death be vacated.

Anti-Semitic bias ranks as "humanity's greatest hatred." Dennis Prager & Joseph Telushkin, *Why the Jews?: The Reason for Antisemitism* 17 (1985). Judge Cunningham's participation in Mr. Halprin's trial despite his anti-Semitic animus offends basic concepts of fairness and religious equality and violates the Constitution's guarantee of due process of law. Like reliance on invidious racial stereotypes, a judge's religious animus represents "a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017).

Just as a federal court must take extraordinary action to correct racial prejudice in the criminal justice system, it must act swiftly and decisively to remove the taint of anti-Semitic bias, or else risk the loss of public confidence in an impartial judiciary. *See Buck*, 137 S. Ct. at 778; *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (A "criminal defendant tried by a biased judge is entitled to have his conviction set aside, no matter how strong the evidence against him." (internal quotation marks and citation omitted)).

Whether Mr. Halprin should receive relief on these facts is a straightforward question. Where and when Mr. Halprin can secure relief from his constitutionally infirm conviction is a complex question, given the procedural posture of the case. As presented in the arguments in the Procedural Arguments below, this Court can review Mr. Halprin's petition despite seeming obstacles.[1] The Anti-Terrorism and Effective Death Penalty Act (AEDPA)'s bar on "second or successive" applications was not intended to apply to Mr. Halprin's fundamental claim of trial error, diligently raised in a second petition only because of a state actor's interference. *See Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (concluding 28 U.S.C. 2244(b) does not apply to second-in-time petition raising new claim of competency to be executed); *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998).

Even though this Court may *eventually* review Mr. Halprin's claim, it should stay this matter pending the completion of Supreme Court *certiorari* review of Mr. Halprin's *initial* federal habeas proceedings, which may moot this claim, and exhaustion in state court, which is ordinarily a prerequisite to federal review. Mr. Halprin presents his claim first to this court in a *protective* petition, filed in order to satisfy the statute of limitations (28 U.S.C. § 2244(d)(1)), even though his claim has not yet been exhausted in state court (28 U.S.C. § 2254(b)(1)). *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) (authorizing a habeas petitioner to "fil[e] a 'protective' petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." (citing *Rhines v. Weber*, 544 U.S. 269, 278 (2005)). Because of the operation of Texas's "two-forum rule," which bars state habeas review while federal habeas proceedings are not stayed,

---

[1] The arguments made below would also support relief from judgment pursuant to Federal Rule of Civil Procedure 60(b).

Mr. Halprin may not even bring his claim in state court until review of his initial federal habeas proceedings is completed in the Supreme Court and his proceedings are stayed in this Court.

## STATEMENT OF FACTS

Mr. Halprin was convicted of capital murder and sentenced to death as a party in connection with the killing of Irving police officer Aubrey Hawkins in the course of a Christmas Eve robbery of a sporting goods store. Judge Vickers Cunningham presided over Mr. Halprin's trial and sentenced him to death.

### A.  Randy Halprin's Crime and Judge Vickers Cunningham's Appointment

In December 2000, Halprin and six other men participated in a notorious escape from the Connally Unit, a Texas Department of Criminal Justice ("TDCJ") prison, in Kenedy, Texas. The escape, Officer Hawkins's murder on Christmas Eve, and the manhunt for the escapees—the so-called "Texas Seven"—drew extensive media coverage.

Even before his arrest, news stories began to document Mr. Halprin's Jewish identity in connection to the events. On January 7, the *Fort Worth Star-Telegram* reported that Mr. Halprin and another escapee, Michael Rodriguez, had applied to attend Jewish worship services less than a year before the escape, which "granted the privilege of worshipping with a rabbi." Miles Moffeit, *Chaplain: Escapees tricked guards; Senior minister says workers at Connally prison were beaten viciously, bound and locked up*, Ft. Worth Star-Telegram, Jan. 7, 2001 (Exhibit 1). A prison chaplain speculated Halprin and Rodriguez were "playing a game . . . of changing their faith so they could exploit worship for extra privileges" and doubted they were "really Jewish." *Id.*

The escapees were captured in a Colorado trailer park in late January 2001, where they had been impersonating devout Christian conventioneers. Michael Janofsky, *Texas Fugitives Fit In at Trailer Park, Neighbors Say*, N.Y. Times, Jan. 24, 2001 (Exhibit 2) ("They told people they were

here to attend a religious convention," one neighbor said. "Whenever they would go outside to work on a vehicle, they would play religious music."). (One escapee took his own life before capture.)

Soon after his arrest, the *Dallas Morning News* reported that Halprin had recruited Rodriguez "because he was Jewish" when the two men attended Jewish religious services at the Connally Unit. *See* Todd Bensman, *Rodriguez invited into plot for getaway car, Halprin says*, Dallas Morning News, Feb. 4, 2001 (Exhibit 3). The article also reported that Mr. Halprin had driven past his childhood synagogue when the escapees were passing through Arlington, Texas, and had spoken with a rabbi in the Colorado jail where he was being held. *Id.*

Early news reports also delved into Mr. Halprin's Jewish background. According to a January 2001 *Dallas Morning News* report,

> By early adolescence, the boy was flunking out of school and mapping sites where he thought space aliens would pick him up. Yet he also showed great ability on another front, mastering the lessons for his bar mitzvah at North Arlington's Congregation Beth Shalom synagogue.
>
> "Here's this kid reading Hebrew and leading the congregation and doing it well," said Chief Waybourn, who attended the coming-of-age ceremony.
>
> Mr. Halprin didn't stick with religious studies, said Janet Aaronson, the synagogue's executive director. The rabbi from that time "remembered that he was a bright kid," she said, "but a troubled kid."

Brook Egerton, *Halprin endured abuse, other hardships as youth*, Dallas Morning News, Jan. 14, 2001 (Exhibit 4).

Mr. Halprin's case, like those of the other members of the Texas Seven, was assigned to Judge Molly Francis of the 283rd Judicial District Court in Dallas. Judge Francis presided over the trial of the leader of the escape, George Rivas, who received a death sentence in August 2001.

Then, in September, in the middle of jury selection for Donald Newbury's trial, Governor Rick Perry appointed Judge Francis to fill a vacant seat on the Fifth District Court of Appeals in

Dallas. *See* Press Release, Office of the Governor, *Governor Announces Appointment of Francis as a Justice of the 5th Court of Appeals*, Sept. 5, 2001 (Exhibit 5).

A month later, Governor Perry appointed Judge Vickers Cunningham to fill Judge Francis's seat on the 283rd District Court. *See* Press Release, Office of *Governor Appoints Cunningham as Judge, 283rd Judicial District*, Oct. 11, 2001 (Exhibit 6). From his appointment, Judge Cunningham knew his principal task would be overseeing the capital trials of the remaining members of the Texas Seven, including Mr. Halprin. Holly Becka, *New judge ready for escapees' trials; Appointee will take over death-penalty cases next month*, Dallas Morning News, Oct. 12, 2011 (Exhibit 7). He told a local magazine that he "wanted the challenge." *Two Woodrow Wilson grads help decide the Texas 7's fate*, Advocate: Lakewood/East Dallas, Aug. 1, 2002, https://lakewood.advocatemag.com/2002/08/01/men-of-the-law/ (Exhibit 8).

Judge Cunningham was a Dallasite, born and bred. He was raised in the Lakewood neighborhood, and was a graduate of Dallas schools and Southern Methodist University. *Id.* His parents Bill "Bulldog" Cunningham and Mina Sue Cunningham were well-connected and active in Republican politics. *See* Declaration of Tammy McKinney ¶ 2 (Exhibit 9) (describing church, country club, and social activities Cunninghams were involved in); Rep. Jeb Hensarling, *Honoring the late Bill 'Bulldog' Cunningham*, The Constituent Register, May 16, 2016, https://the-constituent.com/honoring-mr-bill-bulldog-cunningham-by-representative-jeb-hensarling/speech/69756 (Exhibit 10) ("Bulldog was an active political volunteer, along with his wife, Mina.").

Judge Cunningham was a congregant and admirer of segregationist Pastor W. A. Criswell who led the church Cunningham attended and officiated at Cunningham's wedding. Jim Jones and Mary McKee, *Baptists eulogize Criswell ministry*, Ft. Worth Star-Telegram, Jan. 17, 2002 (Exhibit 11).

From a young age, Cunningham believed it was his "destiny" to serve as a judge. Exh. 8, *Two Wilson Grads*. He took his inspiration from the judges and prosecutors who lived in Lakewood, especially the long-serving Dallas District Attorney Henry Wade, Sr. Cunningham later explained, "I was Henry Wade's paperboy, and I went to school with his daughter . . . . I was so impressed with Henry Wade and his legend." Gromer Jeffers, *The late Henry Wade stirs emotions of DA candidates*, Dallas Morning News, Jan. 24, 2006 (Exhibit 12). After five years as a Dallas County prosecutor, Judge Cunningham was elected to a seat on the Dallas County Criminal Court in 1995, where he sat until his appointment to the district court. Exh. 7, Becka, *New judge ready for escapees' trials*.

In the year and a half following his appointment, Judge Cunningham presided over the trials of Texas Seven defendants Donald Newbury, Michael Rodriguez, and Joseph Garcia, each of whom he sentenced to death. In that time, he also was elected to his district court seat in a contested election in November 2002. *See* Mark Donald, *Life After Lotto; Whatever Happened to the Dallas Public Defenders Who Won the Lottery?*, Texas Lawyer (online), July 19, 2004 (Exhibit 13) (describing 2002 election challenger King Solomon).

## B.  Mr. Halprin's Trial

Randy Halprin was the second to last defendant scheduled for trial. By June 2003, when the trial began, "the killing was pretty old news" and there were "far fewer reporters and spectators than in the earlier trials." Jacquielynn Floyd, *We Shouldn't Be Dulled to the Brutality*, Dallas Morning News, June 10, 2003 (Exhibit 14).

During the trial, Judge Cunningham presided over the questioning and selection of jurors, made critical pre-trial rulings, ruled on the admissibility of evidence relevant to Mr. Halprin's guilt and punishment, instructed the jury, and sentenced Mr. Halprin to death based on the jury's answers to the special issues.

Mr. Halprin was indicted and tried for capital murder under Texas's "law of parties." 1 CR 65. Under the law of parties, the State did not need to prove that Mr. Halprin actually killed or intended to kill. Tex. Penal Code § 7.02. Then, the State could only sentence Mr. Halprin to death if the "actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." Tex. Code Crim. Proc. art. 37.071, § 2(b)(2). As a result, in both phases of his trial, Mr. Halprin's relative culpability and credibility in explaining his role were central issues.

Mr. Halprin testified during the guilt phase of trial that he did not shoot Officer Hawkins, nor did he ever discharge his weapon during the Oshman's robbery. 47 RR 98; 48 RR 24, 55, 102.[2] Halprin testified that during the escape, he did not physically strike anyone, 47 RR 99, and he had essentially no role in planning the escape, and played a minor role in the actual escape. 48 RR 4, 7. He said that after they escaped, the group robbed two other places before Oshman's, but he was only involved in one of those robberies. 48 RR 8, 9. As to Oshman's, Halprin told the jury,

> You know, I, before the robbery, I even told them, I'm not going to go in and carry a gun and there was a little argument and they made it very clear that, you know, it was, you know, their way or the highway. And so I told them I wasn't going to pull a gun and they said, fine, just gather clothes, grab a shopping cart, and gather clothes.

48 RR 14; *id.* at 136. When the shooting began, he "freaked out" and ran off. 48 RR 23.

---

[2] During his testimony, Mr. Halprin pleaded with Judge Cunningham:

> THE DEFENDANT: Your Honor can you please tell them to stop staring at me like that The DAs

> THE COURT: They're just listening to the testimony

> THE DEFENDANT: I understand but they're making strange faces and things like that and its making me uncomfortable and nervous.

47 RR 117-18. When the jury recessed, Judge Cunningham spoke sternly to Mr. Halprin: "Mr. Halprin, you put me in a very bad position. I don't really want to respond to your request in front of the jury. You should have waited until now." 47 RR 119-20.

The trial court repeatedly rebuffed Mr. Halprin's attempts to introduce a prison "ranking document" that rated the escapees' leadership qualities and showed Mr. Halprin "never exhibited leadership qualities," was "[v]ery submissive," and was the "weakest" of the members. *Halprin v. State*, 170 S.W.3d 111, 114-15 (Tex. Crim. App. 2005).

From its opening statement on, the prosecution tried to erase any distinction between Halprin and the other escapees. *E.g.*, 41 RR 38 (referring to "their goal" and "their target"). The State argued at the close of the guilt phase that Mr. Halprin may not "look bad" but "you know he's deceitful" and "different than us," that he could not help but show his "true colors" and "true nature" when he testified. 50 RR 15.

Mr. Halprin's Jewish identity was a recurring subject during Mr. Halprin's trial. For example, when Mr. Halprin testified, he spoke about being "picked on" in prison because he was Jewish:

> [DEFENSE COUNSEL]: Q. Let me show you what has been marked as 954, which was the letter that was introduced by the State. And, once again, this is a letter you wrote; is that correct?
>
> [Halprin]: A. Yes, sir.
>
> Q. You wrote it to Dawn and in here it says - you talking about being in prison and being scared and in regard to the Blacks and the Mexicans and, "The just pick the jews [sic] to blame everything on. They never tried that crap with me. I had a lot of respect from one of the leaders of one of the Arian [sic] gangs over there named Batman who didn't really like me, so to speak, and I didn't like him. *He knew I didn't put up with that antisemitic* [sic] *crap.*
>
> So you might have been picked on because you were jewish [sic], but you at least tried to stand up for yourself being jewish [sic]?
>
> A. Yes, sir.

49 RR 46-47. Out of necessity Halprin formed alliances with Aryan Brotherhood gang members, but belonged to no gang. 49 RR 35-36.

In the punishment phase, the defense presented evidence that Mr. Halprin's life was shaped by his search for a Jewish identity and his desire to please his Jewish father. Mr. Halprin

worked hard to become *bar mitzvah*, an important Jewish rite of passage for adolescent boys. *See* 52 RR 9-11 (Mindi Sternblitz); 52 RR 53-55 (Terri Goldberg). The defense called as witnesses Mr. Halprin's childhood friends, who themselves identified as Jewish. This evidence supported Mr. Halprin's plea for the jury to find "a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment" in his "character or background." *See* Tex. Code Crim. Proc. art. 37.071 § 2(e).

The State, in turn, elicited the fact that Mr. Halprin professed to "hat[ing] Christians with a passion" and "despising everything dealing with Jesus" after he was shipped off to a Christian boarding school in middle school:

> Q. Looking at this exhibit again, do you remember him telling you that, "I think boarding school messed Wesley and I both up. You know, after I was locked up, I really started to hate Christians, I mean with a passion. I guess I blamed a lot of things on that school at first, so I just ended up despising everything dealing with Jesus. I'm not that way, now, though I still don't trust many Christians these days, either."
>
> Did you ever talk to him about that?
>
> A. Not specifically that statement. I know that you know he was raised being Jewish and then all of a sudden he was having to attend these religious services that is contradicting you know what he was raised this whole time. So I can understand that animosity was built up.

52 RR 28 (quoting SX 975 (Letter from Randy Halprin to Mindi Sternblitz, Oct. 4, 2001)).

In a critical ruling, Judge Cunningham denied Mr. Halprin the ability to present mitigating evidence gathered by clinical psychologist Dr. Kelly Goodness. Judge Cunningham held a hearing prior to Dr. Goodness's testimony. 52 RR 88. The State objected to the doctor's report and to the doctor testifying as to hearsay used in forming her opinion. 53 RR 3. The State argued that, pursuant to Texas Rule of Evidence 705, it was "highly prejudicial and unfair to the State" to allow the testimony. 53 RR 3. According to the State, Halprin had to show that the hearsay statements were "otherwise admissible in court" before they could be elicited from

the witness, "[i]f they are not, then it's within this Court's discretion to exclude them." 53 RR 5. Judge Cunningham ruled that Dr. Goodness could testify to her opinion and the sources she used to form that opinion, but could not testify to any specific information contained within those sources. 53 RR 6; 8; 11-12. In rote application of the hearsay rule, the court excluded all details underlying Dr. Goodness's opinions including her conclusion that Halprin's biological parents were drug addicts, 53 RR 30, and an explanation of his expulsion from boarding school, 53 RR 39.

Judge Cunningham also denied Mr. Halprin's motion challenging the constitutionality of the special "law of parties" instruction for the punishment phase as applied to his case. 1 CR 158-171 (arguing Tex. Code Crim. Proc. art. 37.071, § 2(b)(2) fails to satisfy Supreme Court precedent). At the close of the evidence, Halprin's counsel renewed his previous motions, including those attacking § 2(b)(2). 53 RR 73.

At the close of the punishment phase, the prosecution argued that Halprin was a "liar" who "manipulates people," and who was "trying to manipulate one or two of you, hopefully." 53 RR 83. The State went on to argue that Halprin "uses people," and "blames people." 53 RR 84. The prosecution attacked Halprin's assertion and testimony that he was not really a member of this "gang," arguing that Halprin "was not just being drug along or anything." 53 RR 127. The prosecution repeatedly grouped the all of the escapees' actions and intent together, and attributed "their" actions and intent specifically to Halprin. 53 RR 126-128; 135-136; 139. The State contended that Halprin was "as actively involved as the others." 53 RR 128. The State directly challenged Halprin's assertion that "he wants to present himself as the follower, the person who doesn't want to be there, that's reluctant, that doesn't want to go along." 53 RR 128. "He tries to distance himself. I was a follower. I didn't want to be there. That they had to have someone watch me. Don't buy it for a second, folks.

10

He was in it all the way." *53 RR* 133. The prosecution triumphantly proclaimed in the absence of excluded evidence that there was no "significant mitigating evidence." *53 RR* 138.

During its six hours of deliberations over the appropriate punishment, the jury indicated through a note that its answer to the second, anti-parties, special issue turned on the difference between whether Halprin "'anticipated that a human life would be taken' and 'should have anticipated.'" 1 *CR* 45. Up to that point, this was the longest time any Texas Seven jury had deliberated. *See* Robert Tharp, *Jury in escapee trial is still out; Panel sequestered after 5 hours, no agreement on killer's punishment*, Dallas Morning News, June 12, 2003 (Exhibit 15).

**C. Judge Cunningham's Extensive History of Prejudice on the Basis of Religion, Race, Ethnicity, and Sexuality**

Before, during, and after Randy Halprin's trial, Judge Cunningham harbored deep-seated animus towards and prejudices about non-white, non-Christian people. He expressed these views frequently in private and they informed his thinking about his public service in the law.

Tammy McKinney grew up with Vic Cunningham and knew him intimately. Cunningham and McKinney's parents were close friends, ran in the same social circles, went to the same church, and were members of the same clubs. *See* Exh. 9, McKinney Decl. ¶¶ 2-5. McKinney and Cunningham were friendly and "Vic really trusted" McKinney. *Id.* ¶ 6. When he became a judge, Cunningham even offered McKinney the position of court coordinator. *Id.*

But Judge Cunningham's bigotry prevented McKinney and Vic from ever becoming "truly good friends." *Id.* ¶ 8. Cunningham "did not like anyone not of his race, religion or creed, and he was very vocal about his disapproval." *Id.* For example, Cunningham belittled his brother Bill by calling him "nigger Bill" "for as long as [McKinney] can remember." *Id.* ¶ 16. He was "always []like this," but "his level of hatred" seemed to grow with age. *Id.* ¶ 8. By the time McKinney and Cunningham were around thirty—long before Judge Cunningham presided over Mr. Halprin's trial—

McKinney found Cunningham "so hateful." *Id.* ¶ 5. She remembers that "[h]e would regularly use offensive" language "such as 'nigger,' 'wetback,' 'spic,' 'kike,' 'the fuckin' Jews.'" *Id.*

Judge Cunningham "would often use race or ethnicity to refer to people . . . who were members of groups he did not like. . . . If someone were actually African-American, he would call them 'Nigger' and their first name. It was his signature way of talking about people of color. For Jewish people, he would say a 'fuckin' Jew' or a 'goddamn kike.'" *Id.* ¶ 16.

After the Texas Seven trials, Judge Cunningham would "tout with pride his role." *Id.* ¶ 7. When he discussed the cases, he would "often" make "extremely hateful comments" and always mention the defendants' "race, ethnicity or religion." *Id.* According to McKinney, Judge Cunningham "took special pride in the death sentences because they included Latinos and a Jew." *Id.* Judge Cunningham would call Mr. Halprin a "goddamn kike" and "that fuckin' Jew." *Id.* ¶ 13. He also used the term "'wetback' to describe some of the Texas 7 defendants." *Id.* ¶ 8. On at least one occasion, McKinney remembers Cunningham saying, "From the wetback to the Jew, they knew they were going to die." *Id.* ¶ 12. When Judge Cunningham "los[t] inhibitions" and aired his prejudices at parties, he would often return to discussing the Texas Seven. *Id.* ¶ 8. Speaking of his judgeship, "Vic said any 'nigger' or 'wetback' walking into his courtroom knew they were going to go down." *Id.* ¶ 12.

### D. Judge Cunningham's 2006 Campaign for District Attorney

In late 2005, Judge Cunningham resigned his judicial seat in order to run for Dallas district attorney in the Republican primary. Publicly, Judge Cunningham ran as an efficient administrator, who was tough but fair. *See Id.* ¶ 12; Editorial, *Dallas District Attorney: Cunningham offers GOP a breath of fresh air*, Dallas Morning News, Jan. 21, 2006 (Exhibit 16) (editorial board endorsement of Judge Cunningham for "administrative skill" and experience as prosecutor and judge). Privately, Judge Cunningham "said that he was running for DA so that he could return Dallas to a Henry-

Wade style of justice where we did not have to worry about 'niggers,' Jews, 'wetbacks,' and Catholics." Declaration of Amanda Tackett ¶ 7 (Exhibit 17); Exh. 9, McKinney Decl. ¶ 10 (Cunningham said "he wanted to run for office so that he could save Dallas from 'niggers,' 'wetbacks,' Jews, and dirty Catholics"). He said, "My job is to prevent niggers from running wild again." Exh. 17, Tackett Decl. ¶ 13.

Dallas District Attorney Henry Wade's office had become publicly notorious for its institutional practice of discrimination in jury selection. The Supreme Court recognized that at least until 1976 (and likely into the mid-1980s), "the District Attorney's Office had adopted a formal policy to exclude minorities from jury service." *Miller-El v. Cockrell*, 537 U.S. 322, 334-35 (2003). A policy document instructed prosecutors: "'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.'" *Id.* at 335.

One of Judge Cunningham's Republican-primary opponents suggested Cunningham carried the same "racial baggage" from Wade's tenure. Gromer Jeffers, *DA race reflects changing county: Gradual uptick in Democratic support alters campaign tactics*, Dallas Morning News, Feb. 12, 2006 (Exhibit 18). As a Dallas prosecutor, Cunningham had intentionally removed all black prospective jurors during jury selection for a 1992 murder trial. *Id.* Judge Cunningham acknowledged what he had done, but defended the strikes by claiming it was the prospective jurors' Democratic party affiliation, not their race, that triggered the strikes. *Id.*

During the 2006 campaign, Judge Cunningham continued to tout his role in sentencing the Texas Seven to death. A campaign advertisement at that time described how Judge Cunningham had "looked each of the Texas 7 in the eye when he sentenced them to death."[3] Judge Cunningham

---

[3] *Pleeeeaaaazzzze*, Liberally Lean from the Land of Dairy Queen, Feb. 21, 2006, www.liberallylean.com/2006/02/pleeeeaaaazzzze (Exhibit 29).

privately confided he believed God had chosen him to preside over those trials and said that he was "entitled to be" the district attorney because he had presided over the Texas Seven trials. Exh. 17, Tackett Decl. ¶ 6.

In the campaign office and at campaign events, Judge Cunningham resorted to the same bigoted statements that McKinney heard him make his entire life. *Id.* ¶ 9. This was news to campaign volunteer Amanda Tackett, who was enlisted to help by her friend and Judge Cunningham's brother and campaign manager Bill Cunningham. *Id.* ¶ 5. Tackett personally heard Vic refer to Mexicans as "wetbacks," Catholics as "idol-worshippers," Jews as "dirty," and African-Americans as "niggers." *Id.* ¶ 9.

Like McKinney, Tackett heard Judge Cunningham discuss the Texas Seven cases using racial and religious epithets. At a Lakewood campaign event, Tackett recalls hearing Cunningham refer to Mr. Halprin as "the Jew" and others in the Texas 7 as "wetbacks." *Id.* ¶ 15. Cunningham "then launched into his campaign speech about immigration and the importance of White people in the Dallas community." *Id.*

Discussing criminal cases in Dallas, Judge Cunningham would use the phrase "T.N.D."—that is, "typical nigger deals"—as "shorthand for criminal cases involving African-Americans":

> The term referred to the system of justice African-Americans were subjected to. Vic routinely used the phrase "TND" to describe the goings-on around the courthouse. It was a no muss no fuss type of justice. If a case involved a Black person, he'd say, "It's just a nigger doing what niggers do." There was a more extreme connotation when a White was assaulted or killed by a Black.

*Id.* ¶ 11.

On the topic of investigations into wrongful convictions by renowned defense attorney Barry Scheck, Cunningham privately complained that the "'filthy Jew' . . . was going to come in and free

all these 'niggers.'" *Id.* ¶ 13.[4] Judge Cunningham believed the convicted men "should not have the benefit of DNA testing" because "the cases were all TNDs anyhow" and "they are all on death row for a reason." *Id.*

Judge Cunningham also confidentially expressed racial and religious stereotypes about black and Jewish donors and lawyers, even as he publicly courted their contributions and endorsements. Judge Cunningham conceded that "some Jews were good attorneys," but "as far as Jews in general, they needed to be shut down because they controlled all the money and all the power." *Id.* ¶ 9. He referred to Democratic nominee and eventual Dallas district attorney Craig Watkins as "nigger Watkins." *Id.* ¶ 19. Judge Cunningham put on what he called his "nigger tie" when going to a campaign event at a charitable foundation run by African-Americans. *Id.* ¶14.

Judge Cunningham's own mother believed that her son's "biggest burden was his bigotry," Exh. 9, McKinney Decl. ¶ 17, and it would be his "downfall," Exh. 17, Tackett Decl. ¶ 17. Judge Cunningham lost the Republican primary.

---

[4] Barry Scheck, co-founder of the Innocence Project, was interviewed on the PBS program "Frontline" regarding his organization's role in several DNA exonerations in Texas. Transcript, *Burden of Innocence*, https://www.pbs.org/wgbh/pages/frontline/shows/burden/etc/script.html (last visited May 17, 2019). The episode aired on May 1, 2003, a month before Mr. Halprin's trial.

Between the years 2001 and 2006, 10 men convicted in Dallas County were exonerated as a result of DNA testing. *Tenth Dallas County Man in Just Years Is Proven Innocent Through DNA Evidence*, Innocence Project, https://www.innocenceproject.org/tenth-dallas-county-man-in-just-five-years-is-proven-innocent-through-dna-evidence-larry-fuller-set-to-be-released-today/ (last visited May 17, 2019). Since the formation of the Conviction Integrity Unity within the Dallas County District Attorney's Office, 28 Dallas County convictions have been overturned on the basis of DNA evidence. The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration ("search database for 'Texas' 'Dallas County'") (last visited May 17, 2019).

Between 2006 and 2018, Judge Cunningham did not seek elected office. His views did not appear to change, however. In 2008 or 2009, Tackett remembers Judge Cunningham wearing a stereotypical banker's outfit—green visor and suspenders—and declaring that he would be her "Jew banker" at a casino-themed party. *Id.* ¶ 21.

McKinney and Tackett both were aware of a 2014 incident in which Judge Cunningham "interfered with his daughter's . . . relationship with a young Jewish man she dated when she was in college at Texas A&M." Exh. 9, McKinney Decl. ¶ 14; Exh. 8, Tackett Decl. ¶ 21. Tackett recalls Cunningham instructing his daughter to break up with "that Jew boy" when referring to her then-boyfriend. Exh. 17, Tackett Decl. ¶ 21.

That Jewish young man, Michael Samuels, confirmed the incident. *See* Declaration of Michael Samuels (Exhibit 19). He confirmed that he dated Cunningham's daughter Suzy for about two and a half years. He tried to meet Cunningham several times when he returned to Texas, but Cunningham "never made an effort to meet me." *Id.* ¶ 2. Suzy often said that her father was "very opinionated." *Id.* Samuels "began to understand that [Cunningham] did not want to meet with [him] because [he is] Jewish." *Id.* Suzy abruptly and unexpectedly broke up with Samuels in 2014. She eventually explained "that her father did not like [Samuels] because [he] was Jewish" and her father threatened not to pay for her law school tuition unless she broke up with Samuels. *Id.* ¶ 3. Samuels's uncle posted on Facebook about the incident and relayed the same information to McKinney. *Id.* ¶ 14.

### E. Judge Cunningham's 2018 Campaign for County Commissioner and the May 18, 2018 *Dallas Morning News* Exposé

In 2018, Vickers Cunningham again sought office, this time as a county commissioner. Still running as "Judge Cunningham," and still citing the fact that he had "presided over the 'Texas 7' capital murder death penalty trials," he bragged that he "has put more criminals on Death Row than

almost any judge in the nation." *See* "You Know Judge Vic (Ret.)," Judge Vic for Commissioner, http://judgevicforcommissioner.com/about/ (cached May 23, 2018) (Exhibit 20).[5]

Cunningham made it to a run-off election for the Republican nomination. Less than one week before the run-off, the *Dallas Morning News* issued a lengthy story about Judge Cunningham's racism. Naomi Martin, *White, straight, and Christian: Dallas County candidate admits rewarding his kids if they marry within race*, Dallas Morning News, May 18, 2018, https://www.dallasnews.com/news/dallascounty/2018/05/18/marry-white-straight-christian-dallas-county-politician-admits-rewarding-kids-within-traditional-family-values (Exhibit 21). In a videotaped interview for the piece—an excerpt of which was posted with the article (*see* Exhibit 22, video capture of interview on compact disc)—Cunningham revealed his racially prejudiced attitudes. *Id.* Cunningham acknowledged that he had created a living trust for his children that withheld distributions if they opted to marry a nonwhite, non-Christian person. Cunningham explained he was motivated by "my faith of being a Christian"; he "wanted to support my faith" and "traditional family values." *Id.*

Beyond exposing Cunningham's creation of an anti-miscegenation trust fund for his children, the *Dallas Morning News* also reported that people close to Cunningham—including his mother, brother, and a former political aide—knew him to be "a longtime bigot." *Id.*

The article reported, "the former judge repeatedly use[d] the N-word to insult black people behind their backs" and "described criminal cases involving black people as T.N.D.s, short for Typical [N-word] Deals.'" *Id.* The story reported Amanda Tackett's account of another racist incident when Cunningham in 2010 or 2011, had said of "former District Attorney Craig Watkins, who is black, [and] had helped secure exonerations of wrongly convicted men: 'Did you see what

---

[5] The website has since been taken down.

[N-word] Watkins is doing, setting all those [N-words] free?'" *Id.* Cunningham continued, "'He'll never lose an election because all the [N-words] want their baby daddy out of jail.'" *Id.* Tackett summarized: "Vic believes on some level all black people have done something that warrants putting them in jail." *Id.*

When asked about his use of the word "nigger," "Cunningham paused for nine seconds. He asked if the question referred to using the word in court. Told the question referred to use in everyday life, he then said no." *Id.* Cunningham's brother, Bill, reported that Cunningham routinely referred to Bill's husband, a black man, as "your boy," and refused Bill's husband entry into his home. Exh. 22, Martin, *White, straight and Christian.* (And Bill Cunningham confirmed that Vic called him "[N-word] Bill" his entire life. *Id.*) Meanwhile, a text message authored by Cunningham's son further revealed that Cunningham's racial bigotry extended not only to African Americans, but to nonwhite people in general:

> I am making my father except [sic] interracial relationships starting with me and my relationship with my Vietnamese girlfriend. It's a slow process but [] i have faith in him turning around. And if he doesn't he will have one less person at his dinner table.

*Id.* Confronted with the evidence and allegations pointing to his racist attitudes, Cunningham denied their veracity. *Id.* And although "[a]s a judge in [Dallas] county for 10 years, he sent scores of black and Hispanic people to prison," Cunningham claimed that "his views on his children marrying outside their race never translated into unfairness on the bench or discrimination in any way." *Id.*

The *Morning News* story was shared widely and garnered national attention. The *Dallas Morning News* editorial page retracted their endorsement. Editorial, *We withdraw Vickers Cunningham recommendation in GOP runoff for Dallas County Commissioners Court Precinct 2,* Dallas Morning News, May 19, 2018 (Exhibit 23). The local Republican party condemned his

statements. Naomi Martin, *Dallas County GOP slams one of its own candidates for alleged 'racist language and behavior*,' Dallas Morning News, May 19, 2018 (Exhibit 24).

Judge Cunningham took to his campaign website to post a "personal note from Vic Cunningham." "A Personal Note from Judge Vic Cunningham," http://judgevicforcommissioner.com/about/ (cached May 23, 2018) (Exhibit 25). The judge admitted he set up the trust and stated that his "views on interracial marriage have evolved since [he] set-up the irrevocable trust in 2010." *Id.* He categorically denied ever using the word "nigger," attacked his brother's motives, and pointed out that Tackett's story was "without collaboration [sic: corroboration]." *Id.* Judge Cunningham lost the run-off election by 25 votes. Naomi Martin, *Dallas candidate who promised to reward kids for marrying white loses by 25 votes*, Dallas Morning News, May 22, 2018 (Exhibit 26).

## JURISDICTIONAL ALLEGATIONS

Mr. Halprin is a Texas prisoner in the custody of Respondent Lorie Davis in the Polunsky Unit in Livingston, Texas.

Mr. Halprin pleaded not guilty to a charge of capital murder entered in the 283rd District Court, Dallas County, Texas in Cause No. F01-00237-T. Following a jury trial before Judge Vickers Cunningham, the jury found Mr. Halprin guilty on June 9, and returned a sentence of death on June 12, 2003.

Mr. Halprin had an automatic appeal to the Texas Court of Criminal Appeals ("TCCA") in Cause No. AP-74,721. The TCCA affirmed on June 29, 2005. *Halprin v. State*, 170 S.W.3d 111 (Tex. Crim. App. 2005). On appeal, Mr. Halprin raised nineteen points of error.[6] *Id.* Mr. Halprin did not seek a writ of certiorari from the Supreme Court of the United States.

---

[6] Mr. Halprin raised two points of error related to the trial court's exclusion of mitigation evidence; ten points of error regarding the trial court's rulings during jury selection from the primary panel;

On April 6, 2005, Mr. Halprin timely filed an application for writ of habeas corpus in the TCCA which was given Cause No. WR-77-174-01. As described in the Statement of Facts, in late 2005, Judge Cunningham resigned his judicial seat in order to run for Dallas District Attorney in the Republican primary. After two changes of presiding judge, the trial court adopted the State's proposed findings of fact and conclusions of law with minimal alterations. The TCCA adopted the trial court's findings and conclusions and denied relief on March 20, 2013. *Ex parte Halprin*, 2013 WL 1150018. In his application, Mr. Halprin raised thirty-one allegations challenging his conviction and sentence. *Id.* at *1.

On March 20, 2014, Mr. Halprin filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in this Court. *Halprin v. Davis*, 3:13-cv-01535-L, ECF No. 5. He then filed an amended petition on June 17, 2014. ECF No. 15. On September 27, 2017, the Court issued a memorandum opinion and order denying relief, ECF No. 49, and a judgment which dismissed Mr. Halprin's petition with prejudice. ECF No. 50.

Mr. Halprin moved for a Certificate of Appealability ("COA") in the Fifth Circuit. His motion was denied on December 17, 2018, *Halprin v. Davis*, 911 F.3d 247 (5th Cir. 2018), as were his subsequent petitions for rehearing, *see* Order Denying Petition for Panel Rehearing and Rehearing En Banc, *Halprin v. Davis*, No. 17-70026 (5th Cir. Jan. 29, 2019).

On April 9, Justice Alito granted Mr. Halprin's motion to extend the time to file a petition for writ of certiorari until May 29, 2019. On May 13, 2019, the Supreme Court extended Mr. Halprin's time to file to June 12, 2019. *See Halprin v. Davis*, No. 18A1032 (U.S.).

---

three points of error regarding the trial court's rulings during the alternate jury selection process; and four points of error related to the prosecution's questioning during jury selection. *Halprin v. State*, 170 S.W.3d at 113-18.

## GROUND FOR RELIEF

**CLAIM 1.**      **Trial Judge Vickers Cunningham's Bias Against Defendant Randy Halprin Because He Is Jewish Violated Mr. Halprin's Fourteenth Amendment Right to Due Process of Law.**

### A. Legal Standard

The U.S. Constitution forbids the participation of a judge in a criminal trial who harbors an actual bias or an objectively intolerable risk of bias at trial. Due process of law, as guaranteed by the Fourteenth Amendment, requires "[a] fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955); U.S. Const. amend. XIV.

*Objectively Intolerable Risk of Bias.* The constitutional right to an impartial judge does not merely require the "absence of actual bias." *Murchison*, 349 U.S. at 136. "[O]ur system of law has always endeavored to prevent even the probability of unfairness," because "justice must satisfy the appearance of justice." *Id.* Any "possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

Thus, a judge's participation in a criminal trial offends due process when an objective observer, "considering all the circumstances alleged," would conclude "the risk of bias was too high to be constitutionally tolerable." *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017); *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) ("The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009))).

*Structural Error.* The violation of a defendant's right to a fair tribunal is a structural constitutional error and so is not subject to harmless error review. *Tumey*, 273 U.S. at 535. That is because a biased judge presiding over a criminal trial is a basic defect in the "whole adjudicatory

framework." *Williams*, 136 S. Ct. at 1902. It is impossible to catalog the many ways a biased trial judge may have affected the proceedings: "The entire conduct of the trial from beginning to end is obviously affected . . . by the presence on the bench of a judge who is not impartial." *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

Moreover, a reviewing court may not be able to detect a biased judge's influence. Courts "cannot review a trial transcript to determine whether the presiding judge, despite his actual bias, was fair: 'The record does not reflect the tone of voice of the judge, his facial expressions, or his unspoken attitudes and mannerisms, all of which, as well as his statements and rulings of record, might have adversely influenced the jury and affected its verdict.'" *Norris v. United States*, 820 F.3d 1261, 1266 (11th Cir. 2016) (quoting *United States v. Brown*, 539 F.2d 467, 469 (5th Cir. 1976)). A judge's "lightest word or intimation is received [by jurors] with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894). Therefore, a "'criminal defendant tried by a biased judge is entitled to have his conviction set aside, no matter how strong the evidence against him.'" *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (quoting *Edwards v. Balisok*, 520 U.S. 641, 647 (1997)).

*Nature of the Bias.* The nature of the bias at issue in Mr. Halprin's case is different and more pernicious than the kind presented in previous cases the Supreme Court has identified as mandating recusal.

The Court has previously found a judge's participation unconstitutional where he had "earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case." *Williams*, 136 S. Ct. at 1910 (judge authorized decision to seek death sentence); *see also Murchison*, 349 U.S. at 134 (judge may not serve as both a "one-man grand jury" and as the trier of contempt charges that he initiated). And the Constitution requires that a judge must recuse herself where she has a slight financial interest in the outcome of the case. *See Tumey*, 273 U.S. at 520

(mayor-judge received a salary supplement only for convictions); *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972) (similar); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 823-24 (1986) (disqualification required where state supreme court justice was plaintiff in almost identical insurance case in lower state court). Recusal may also be constitutionally necessary as a result of events involving judicial elections, where a litigant's campaign contributions have a "significant and disproportionate influence" in placing a judge on a specific case. *Caperton*, 556 U.S. at 884, 887. As with all these circumstances, a judge's religious and racial bias makes it intolerably likely that a defendant—who is a member of the disfavored race or religion—will be tried by a court "predisposed to find against him." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

When a judge expresses religious and racial bias and presides over a *capital* trial, it represents "a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). As the Texas Supreme Court stated 130 years ago, "Cases ought to be tried in a court of justice upon the facts proved; and whether a party be Jew or gentile, white or black is a matter of indifference." *Moss v. Sanger*, 12 S.W. 619, 620 (Tex. 1889) (reversing civil judgment where attorney made derogatory remarks about Jewish party).

The "basic premise" not to punish people for *who they are* finds expression not just in the Constitution's guarantee of a fair tribunal, but in other fundamental constitutional rights, protecting religious liberty and equal protection under the law. *See* U.S. Const. amend. I, XIV.

"The clearest command of the Establishment Clause is that one religious denomination"— or one religion—"cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). It follows that judges, as state actors, may not "denigrate . . . religious minorities" through their practices. *Town of Greece v. Galloway*, 572 U.S. 565, 583 (2014). The Free Exercise Clause likewise preserves religious conscience from state persecution. It "protects against governmental

hostility which is masked, as well as overt," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993), and outlaws even "'subtle departures from neutrality' on matters of religion," *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 540 (1993)).

The Equal Protection Clause provides yet another mandate to root out religious, racial, and ethnic prejudice.[7]   The Fourteenth Amendment reflects an "imperative to purge racial prejudice from the administration of justice." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017). Racial bias differs in kind from other forms of bias like a pro-defendant bias or a relationship to a witness. *Id.* Racial bias is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* For this reason, the Court mandated a constitutional exception to a well-established state rule barring impeachment of jurors with their statements at least "where a juror made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id.* at 869.

In *Buck v. Davis*, Chief Justice Roberts condemned even the slightest injection of racial stereotypes into a capital trial. 137 S. Ct. at 778. Explicit racial stereotypes were "toxi[c]"—"deadly [even] in small doses." *Id.* at 777.  The toxin poisons not just the defendant's trial, but "'poisons public confidence' in the judicial process," and undermines the legitimacy of "the law as an institution, . . . the community at large, and  . . . the democratic ideal reflected in the processes of our courts." *Id.* at 778 (quoting *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015), and *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)).

---

[7] Hatred of Jews has sometimes been characterized as a racial or ethnic prejudice, not only a religious one. *See* Prager & Telushkin, *Why the Jews?* 151-154 (discussing Nazi anti-Semitic racism). In discussing prejudice against Latinos, the Supreme Court has used both the language of race and of ethnicity. *See Pena-Rodriguez*, 137 S.Ct. at 863.

Equal administration of justice for religious minorities is no less important. "The danger of stigma and stirred animosities is no less acute for religious line-drawing than for racial." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 728 (1994) (Kennedy, J., concurring in the judgment); *see also Murphy v. Collier*, No. 18A985, 2019 WL 2078111, at *2 (U.S. May 13, 2019) (statement of Kavanaugh, J., joined by Roberts, C.J., respecting grant of application for stay of execution) (discussing "the Constitution's guarantee of religious equality").

In sum, a judge's religious and racial prejudices are uniquely offensive to the Constitution and the legitimacy of the criminal justice system. Even the slightest influence of racial and religious stereotypes will make a trial fundamentally unfair.[8] A right to a trial free from a judge's religious and racial bias secures these fundamental principles of equality and religious liberty.

Finally, the Eighth Amendment demands especially stringent review of a judge's impartiality in a death-penalty trial. As the D.C. Circuit recently observed in vacating three years' of capital proceedings before a biased Guantanamo military commission: "in no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d 224, 231 (D.C. Cir. 2019); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality opinion) ("[T]he [Supreme] Court has been particularly sensitive to ensure that every safeguard is observed."). From jury selection through the penalty-phase verdict, proceedings in a capital case are structured to culminate in an individualized assessment of the defendant and his crime.

> [A]s *Woodson v. North Carolina*, 428 U.S. 280 (1976), made clear, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the

---

[8] *See also United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980) (when an extrajudicial bias or prejudice is "somehow related to a suspect or invidious motive," "only the slightest indication of the appearance or fact of bias or prejudice arising from these sources would be sufficient to disqualify.").

circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304 (plurality opinion).

*Penry v. Lynaugh*, 392 U.S. 302, 316 (1989). A judge's reliance on pernicious group-based stereotypes is anathema to this cornerstone Eighth Amendment precept.

> **B.** Judge Cunningham's Animus Against Mr. Halprin as a Jewish Person Introduced an Objectively Intolerable Risk of Bias into Mr. Halprin's Capital Trial.

Judge Vickers Cunningham's anti-Semitic prejudice against Mr. Halprin violated Mr. Halprin's right to a fair trial in a fair tribunal.

> **1.**  *Judge Cunningham's Prejudiced Comments About Mr. Halprin*

According to two independent sources, Judge Cunningham referred to Mr. Halprin using hateful epithets when discussing his case. *See* Exh. 9, McKinney Decl. ¶ 7 (calling Mr. Halprin "fucking Jew"); *id.* at ¶ 13 (calling Mr. Halprin "that fuckin' Jew" and "goddamn kike"); Exh. 17, Tackett Decl. ¶ 15. When he spoke about his role in the Texas Seven cases, he "took special pride in the death sentences because they included Latinos and a Jew." Exh. 9, McKinney Decl. ¶ 7. McKinney remembers Cunningham saying, "From the wetback to the Jew, they knew they were going to die." ¶ 12.

These statements disclose far more than an unmistakable bias against Jewish people generally. The statements identify Mr. Halprin himself, evince a specific animus against Mr. Halprin because of his Jewish identity, and indicate that Judge Cunningham took satisfaction from his role in Mr. Halprin's death sentence *because* he is a *"fucking Jew"* and a "goddamn kike." *Cf. Moss*, 12 S.W. at 620 ("Cases ought to be tried in a court of justice upon the facts proved; and whether a party be Jew or gentile, white or black is a matter of indifference."); *Buck*, 137 S. Ct. at 778 ("Our law punishes people for what they do, not who they are.").

Judge Cunningham's use of racial and religious slurs to describe Mr. Halprin and the other Texas Seven defendants serves as *direct* evidence of his animus. "[R]outine use of racial slurs constitutes direct evidence that racial animus was a motivating factor" for the decision-maker. *Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (use of "nigger" was direct evidence of employers discrimination in Title VII case). The terms "the Jew," "fucking Jew," and "goddamn kike"—all of which Judge Cunningham called Mr. Halprin—are slurs, plain and simple.

So is the term "wetback." *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993) (term is "ethnic slur"); *Ex parte Guzmon*, 730 S.W.2d 724, 733 (Tex. Crim. App. 1987) (counsel's repeated use of slur in death-penalty trial to describe defendant was "particularly harmful" because it exacerbated the jury's "doubts that such an illegal alien was entitled to all the protections United States citizens are afforded").[9]

The term "*the* Jew" is pejorative as Judge Cunningham used it. As Professor Bryan Stone explains, the use of the term "the Jew" has a long historical lineage and, when applied to an individual, "diminishes the individuality and humanity of a single person by attaching to them the perceived attributes of the group of which they are a member." Report of Professor Brian Stone, Ph.D.[10] at 18 (Exhibit 28).  This suggests to the listener that "the individual has no qualities other

---

[9] For summaries of the history of the term and the injury it causes, see Marisa Gerber, For Latinos, a Spanish Word Loaded with Meaning, L.A. Times (Apr. 1, 2013), http://articles.latimes.com/2013/apr/01/local/la-me-latino-labels-20130402; Gregory Korte, Mexican Slur Has Long History in American Politics, USA Today (Mar. 29, 2013, 6:30 PM), http://www.usatoday.com/story/news/politics/2013/03/29/mexican-immigration-slurhistory/2036329/.

[10] Bryan Stone is Professor of History at Del Mar College in Corpus Christi, Texas, and the author or editor of two books about Texas Jews, including *The Chosen Folks: Jews on the Frontiers of Texas* (2010), the first scholarly narrative history of the Texas-Jewish community. *See* Exh. 27, Stone Report at 2 (credentials); Curriculum Vitae, Bryan Stone (Exhibit 29).

than those shared with the mass, that they are nothing more than the class they are a part of." *Id.*
The term reduces the individual to "their supposedly debased inherited traits." *Id.*

Judge Cunningham's use of "the Jew" as pejorative is consistent with his anti-Semitic mindset
about Jewish people and his pattern of anti-Semitic epithets. For example, in another incident, Ms.
Tackett recalls Judge Cunningham wearing a stereotypical banker's outfit and declare that he would
be her "Jew banker" at a casino-themed party. Exh. 17, Tackett Decl. ¶ 21. The phrase invokes the
anti-Semitic character Shylock from Shakespeare's *Merchant of Venice* and other pejoratives like
"*to jew, to jew down, jewed,* or *jewing*—meaning to bargain with, haggle, or cheat—[and] derives from
ancient canards about Jewish corruption and greed." Exh. 27, Stone Rpt. at 17. Professor Stone,
quoting the *Dictionary of Jewish Usage,* writes, "As an adjective . . . *Jew* is now considered derogatory.
Usages like 'a Jew lawyer' or 'a Jew holiday' are offensive to Jews, and sensitive non-Jews avoid using
them." *Id.* at 17.

Tackett also recalls Cunningham instructing his daughter to break up with "that Jew boy"
when referring to her then-boyfriend. Exh. 17, Tackett Decl. ¶ 21. Drawing on his own research,
Prof. Stone reports the term "Jewboy" is a belittling term. Exh. 27, Stone Report at 19.

Judge Cunningham also employs negative stereotypes and tropes about Jewish people. He
professes to believe that Jews "need[] to be shut down because they control[] all the money and all
the power." Exh. 17, Tackett Decl. ¶ 9. Judge Cunningham also stated that Jews were "dirty." These
are common Jewish tropes. Professor Stone explains that although the "dirty" trope is "ancient,"
Exh. 27, Stone Report at 18, it was used in an anti-Semitic speech by Judge Cunningham's late pastor,
*id.* at 13, and "it was common for European anti-Semites, most conspicuously the Nazis, to describe
Jews not only as 'dirty' or 'filthy' but as 'parasites,' 'rodents,' 'bacteria,' or 'scum,'" *id.* at 18. The idea
that Jewish people control the world's finances and pull the levers of power is also an old anti-Jewish
canard, expressed in conspiracy theories like the *Protocols of the Elders of Zion. See* Prager &

Telushkin, *Why the Jews?* 42, 202 n.3 (describing *Protocols* as forgery which "claims to outline the program of a Jewish world conspiracy").

These statements reflect lifelong prejudices. It is implausible that Judge Cunningham only acquired his animosity toward Jews in the not-quite three years between the conclusion of Randy Halprin's trial in June 2003 and 2006 when Amanda Tackett recalls hearing these statements. As Tammy McKinney states, Judge Cunningham has "always" been bigoted and has a long history—pre-dating the trial—of making offensive and derogatory remarks about Jewish people and other racial and religious minorities. *See* Exh. 9, McKinney Decl. ¶ 5 ("always been like this"), ¶ 8 (by the age of thirty), ¶ 16 (calling brother "nigger Bill" as long as she can remember). And his brother Bill says Judge Cunningham has been using the word "nigger" to mock him "his entire life." Exh. 21, Martin, *White, Straight, and Christian.*

Judge Cunningham must have been aware of Mr. Halprin's Jewish identity no later than the beginning of trial. He certainly was aware that Mr. Halprin is Jewish before the close of evidence in the guilt phase. *See* 49 RR 46-47 (Halprin's testimony about getting "picked on" for being Jewish).

Given his lifelong views, Judge Cunningham must have been aware that he was required to recuse himself given his bias. Texas law mandated his recusal even without a motion. *See* Tex. Civ. R. 18b(a), (b)(1)-(2) )("[a] judge must recuse" whose "impartiality might reasonably be questioned" and who "has a personal bias or prejudice concerning . . . a party"); *McClenan v. State*, 661 S.W.2d 108, 109 (Tex. Crim. App. 1983) (finding "bias as a ground for [judicial] disqualification [where] bias is shown to be of such a nature and to such an extent as to deny a defendant due process of law."), *overruled in part on other grounds by De Leon v. Aguilar*, 127 S.W.3d 1 (Tex. Crim. App. 2004); *see* 48B Robert Schuwerk & Lillian Hardwick, *Texas Practice Series: Handbook of Texas Lawyer and Judicial Ethics* § 40:44 ("a judge may err by

not recusing *sua sponte*" on a record indicating bias). Judge Cunningham's failure to do so only

provides a further inference that he was acting pursuant to his bias. (If, on the other hand, no

Texas law mandated Judge Cunningham's recusal or disqualification *sua sponte*, then Texas

law's failure to so mandate would itself be constitutionally problematic under due process.)

Like the case of the "many dishonest judges exposed and convicted through 'Operation

Greylord,' a labyrinthine federal investigation of judicial corruption in Chicago," *Bracy v. Gramley*,

520 U.S. 899, 901 (1997), Judge Cunningham's overt, unremitting racial and religious prejudice is

shocking and "happily, not the stuff of typical judicial-disqualification disputes." *Id.* at 905. Amanda

Tackett herself describes Judge Cunningham as an outlandish figure, more akin to a racist villain in

a movie like "Mississippi Burning" than a real-life judge. *See* Exh. 17, Tackett Decl. ¶ 19; Exh. 21,

Martin, *White, Straight, and Christian*.[11] But the evidence presented here is of a piece with Judge

Cunningham's recorded statements and acknowledged conduct. Judge Cunningham asserted that

"my faith" as a Christian gave him reasons for creating a financial incentive for his children to marry

only white, Christian, heterosexuals.[12] Exh. 22 (video); *see also* Exh. 21, Martin, *White, straight and*

*Christian*. He made that trust in 2010 and only later said his views had changed. *See* Exh. 26, "A

---

[11] But it should come as no surprise that Judge Cunningham hid his biases from public view for so long. As historian Bryan Stone reports, "the relative success and general tolerance Jews have enjoyed in Dallas may have had the perverse effect of driving anti-Semitic attitudes and speech from public into private spaces." Exh. 27, Stone Report at 1. In places like exclusive, private clubs, "where the presence of Jews (not to mention of African Americans, Latinos, and often women) could be strictly regulated, members of the city's white, male, gentile elite could be themselves." *Id.* at 10. Thus, it is quite unremarkable that anti-Semitic views like Judge Cunningham's could occur unabashedly, and without the threat of public stigma.

[12] As the late Justice Scalia wrote, when a judge's religious beliefs conflict with his oath and duty to apply the law, "the choice ... is resignation." Antonin Scalia, *God's Justice and Ours: the Morality of Judicial Participation in the Death Penalty, in Religion and the Death Penalty: A Call for Reckoning* 234 (Owens, et al., eds., 2004).

Personal Note from Vic Cunningham." But in 2014 he used payment for his daughter's legal education to induce her to break up with her longtime boyfriend because he was Jewish.

Judge Cunningham expressed beliefs against racial mixing on the basis of race and religion. Historically, reasons for anti-miscegenation are grounded in a belief in the inferiority of other races and an effort to "maintain White Supremacy." *Loving v. Virginia*, 388 U.S. 1, 11 (1967) ("The fact that Virginia prohibits only interracial marriages involving white persons demonstrates that the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy."). Viewed through the lens of history, Cunningham's opposition to interracial marriage, and his invocation of "my faith of being a Christian" to justify this belief, reflect his endorsement of white supremacy and his attendant belief in the social and biological inferiority of non-white persons.

Judge Cunningham was a protégé of Rev. W.A. Criswell, whose segregationist views were notorious, *see* Jones & McKee, *Baptists eulogize Criswell ministry*:

> "Criswell became one of the pulpit's most visible defenders of segregation." In a speech in South Carolina, "Criswell demanded separation not just of the races, but of religions as well. Invoking images of filth and dirt frequently used in depictions of African Americans and Mexican Americans, Criswell called integration the work of 'outsiders' (by implication Jews) in 'their dirty shirts.'" If not stopped, he continued, they would "get in your family." Christians, he said, had to resist this amalgamation and "stick to their own kind." Views like Criswell's were common in Dallas, Phillips says, but "Criswell's vitriol still stood out in an age of widespread demagoguery and garnered national headlines."

Exh. 27, Stone Report at 13 (quoting Michael Phillips, *White Metropolis: Race, Ethnicity, And Religion in Dallas, 1841–2001* 133–34 (2006)).

Judge Cunningham's confessed anti-miscegenation attitudes dovetail precisely with the reports of declarants that Judge Cunningham sought to further white supremacy in his role as judge and would-be district attorney. Tackett reports that Judge Cunningham made the slurs about the Jewish and Latino Texas Seven defendants shortly before "launch[ing] into a campaign speech

31

about immigration and the importance of White people in the Dallas community." Exh. 17, Tackett Decl. ¶ 15. Judge Cunningham spoke admiringly of a "style of justice where we didn't have to worry about niggers, Jews, wetbacks, or Catholics." *Id.* ¶ 7.[13] He also believed that "my job is to prevent niggers from running wild again." *Id.* ¶ 13.

McKinney also heard Judge Cunningham say "that he could save Dallas from 'niggers, wetbacks, Jews, and dirty Catholics.'" Exh. 9, McKinney Decl. ¶ 10. Again, Judge Cunningham not only thinks in racial stereotypes, he equates Mr. Halprin's group and Catholics of any ethnicity with the non-whites he denigrates.

Judge Cunningham expressed odious group-based beliefs about criminality and just desert regarding black defendants. Judge Cunningham's repeatedly used the term "T.N.D." to characterize the sentences that black defendants received. *See* Exh. 17, Tackett Decl. ¶ 11. This reflects group-based stereotypes about black criminality and the view that non-white defendants deserve punishment that white defendants would not deserve. Even if Judge Cunningham had not spoken

---

[13] Judge Cunningham's ideology parallels the historic rhetoric of the early twentieth century Ku Klux Klan. As Professor Stone explains,

> Whereas the Reconstruction-era organization focused its wrath almost entirely on freed African Americans, the Second Klan was more purposeful in its effort to build a dues-paying membership, and it played to the nation's broadest and deepest prejudices against blacks, Catholics, immigrants, socialists, and Jews. "[Simmons] would warn that 'degenerative' forces were destroying the American way of life," explains historian Linda Gordon. "These were not only black people but also Jews, Catholics, and immigrants. Only a fusion of racial purity and evangelical Christian morality could save the country."

Exh. 27, Stone Report at 6 (quoting Linda Gordon, *The Second Coming of the KKK: The Ku Klux Klan of the 1920s and the American Political Tradition* (New York, 2017)). This "second" incarnation of the Klan was especially successful in Dallas, which was considered a "Klan town." *Id.* at 6-7.

directly about Mr. Halprin's trial and used pejorative language that bespeaks his anti-Semitic bias, numerous other pieces of evidence would establish his bias.

Based on her lifelong association with Judge Cunningham, McKinney believes that he sought out positions of power so that he could hurt people from different races and religions. Exh. 9, McKinney Decl. ¶ 9. Judge Cunningham asserted publicly that he "wanted the challenge" of presiding over the Texas Seven trials and believed it was his "destiny" to be a judge. Exh. 7, *Two Wilson Grads*. Those public statements are consistent with the statements and views attributed to him by Tackett, specifically, "he was anointed by God and chosen by God to preside over the Texas 7 trials." McKinney Decl. ¶ 6. In 2018, he still proudly boasted that he "has put more criminals on Death Row than almost any judge in the nation." Exh. 20, "You Know Judge Vic."

Even setting aside the evidence of anti-Semitic animus Judge Cunningham expressed against Mr. Halprin, there is yet another reason that Judge Cunningham likely was biased against him—the fact that Mr. Halprin participated in the escape and robberies with Latino men whom he called "wetback" or "spic." Exh. 9, McKinney Decl. ¶¶ 5, 8, 10, 12; Exh. 17, Tackett Decl. ¶¶ 7, 9, 15. This association may itself have caused an intolerable risk of bias. And Mr. Halprin's close coordination with the Latino men was centrally at issue in trial. *See* 53 RR 126-128; 135-136, 139.

## 2.     In Light of All the Facts and Circumstances, an Objective Observer Would Find the Risk of Bias Intolerably High

An objective observer would conclude that Judge Cunningham could not prevent his personal prejudice against Jewish people from affecting his treatment of Mr. Halprin, whom he knew to be Jewish. This Court should find that Judge Cunningham had an intolerably high risk of bias in violation of the Constitution.

Judge Cunningham's participation in Mr. Halprin's case threatens the public's confidence in the criminal justice system. Those that know Judge Cunningham's bias best—including his own

mother—believe that it defined him. He could not have ruled impartially in Mr. Halprin's case. Average citizens doubted his ability to rule fairly just by reading the facts unearthed in the *Dallas Morning News* story—a mere subset of the total evidence alleged here. And courts and judicial conduct tribunals around the country have found similar overt statements of racial bias prevent a judge from satisfying the appearance of impartiality.

There can be nothing more offensive to constitutional commitments to racial and religious equality than Judge Cunningham's comments. Judge Cunningham's bias in Mr. Halprin's proceedings harms not only Mr. Halprin, but undermines the public's confidence that criminal justice has been—and will be—dispensed. *See Williams*, 136 S. Ct. at 1909 ("[T]he appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself."); *Buck*, 137 S. Ct. at 778 (relying on racist stereotypes "poisons public confidence in the judicial process," and undermines the legitimacy of "the law as an institution, the community at large, and the democratic ideal reflected in the processes of our courts." (cleaned up)); *Pena-Rodriguez*, 137 S. Ct. at 869 (finding constitutional remedy for juror's racial bias is "necessary to prevent a systemic loss of confidence in jury verdicts").

The Fifth Circuit has found a judge was not impartial on similarly egregious facts. In *United States v. Brown*, 539 F.2d 467 (5th Cir. 1976), a judge met an attorney at a motel swimming pool during a bar association convention. *Id.* at 468. The judge told the attorney that "he was going to preside at [Brown's] trial and 'that he was going to get that nigger.'" *Id.* Citing *Murchison*, 349 U.S. at 136, and the "fair trial concept," the Fifth Circuit found "the judge's statement did not comport with the appearance of justice, and it cannot be said from the record alone that appellant received a fair trial." *Id.* at 470.

Judicial conduct tribunals have also found that making private, bigoted comments threatens the court's appearance of impartiality, even where there was no direct comment on a criminal defendant in a proceeding before the judge.

- *In re Stevens,* 645 P.2d 99, 99-100 (Cal. 1982): In California, a superior court judge continually referred to black litigants as "coons," "jigs," "niggers," and to Latinos as "Mexican jumping beans" and "spics" in statements to "friends," court personnel, court clerks, and in "private." His discipline was public censure.

- *In re Complaint of Judicial Misconduct*, 751 F.3d 611 (U.S. Comm. on Judicial Conduct and Disability 2014): Misconduct included "hundreds of inappropriate email messages that were received and forwarded from [District Judge] Cebull's court email account," including "race-related emails that 'showed disdain and disrespect for African Americans and Hispanics, especially those who are not in the United States legally'; 'emails related to religion [that] showed disdain for certain faiths'; 'emails concern[ing] women and/or sexual topics and were disparaging of women'; 'emails contain[ing] inappropriate jokes relating to sexual orientation'...." *Id.* at 616. The Committee adopted the Ninth Circuit Judicial Council's conclusion that Judge Cebull's "email practices create a substantial possibility that his neutrality could be questioned" and ordered training in order "[t]o restore the public's confidence that any possible conscious or unconscious prejudice will not affect future decisions." *Id.* at 624.

- *In re Eakin*, 150 A.3d 1042, 1058 (Pa. Ct. Jud. Disc. 2016): Based on its review of the stipulated evidence—hundreds of those emails are offensive on the basis of race, gender, sexual orientation, religion, class or ethnicity--the Court of Judicial Discipline determined that the Judicial Conduct Board had established by clear and convincing

evidence that Pennsylvania Supreme Court Justice Eakin's conduct violated Canon 2A of the Code of Judicial Conduct - failure to conduct himself in a manner that promotes confidence in the integrity and impartiality of the judiciary.

Those who knew best Judge Cunningham's prejudiced beliefs doubt his ability to perform his judicial duties impartially. Judge Cunningham's own mother considered his bigotry his "biggest burden," Exh. 9, McKinney Decl. ¶ 17, and predicted his bigotry would be "his downfall." *Id.*; Exh. 17, Tackett Decl. ¶ 17. Amanda Tackett believes that Judge Cunningham could not set aside his biases when he was a judge. Exh. 17, Tackett Decl. ¶ 23. Tammy McKinney, drawing on her "personal and intimate knowledge of [Judge Cunningham]," "do[es] not believe for one second that Vic could be impartial in any of the Texas Seven cases, or any of the other cases that involved Jewish people, or people of color, in his courtroom." She bases her view on the total picture of Judge Cunningham's prejudice:

> [their] long association as family friends, how openly and honestly he has constantly expressed his prejudices and bigotry, how much he has used his role in the Texas 7 case to promote himself, [] how he talked with certainty about the outcome of the Texas 7 cases, and the way he has repeatedly referred to Latinos as "wetbacks" and Jewish peoples as "goddamn kikes."

Exh. 9, McKinney Decl. ¶ 18.

Finally, recent empirical research on explicit and implicit biases in criminal sentencing appears to confirm common sense: that a judge who harbors these explicit negative stereotypes about groups would not judge individuals from those groups fairly. Even many judges who disclaim any conscious bias against Jewish people—and who take an oath to judge impartially—still exhibit implicit biases in judging Jewish people. A study of actual judges surveyed the judges' explicit attitudes toward Asians and Jews, tested them for implicit associations that revealed bias, and asked them to perform a mock sentencing task involving a Jewish or Asian defendant. Both "[f]ederal and state judges displayed strong to moderate implicit bias against Jews (relative to Christians) on the stereotype

36

[implicit association test], such that Jews were associated with negative moral stereotypes (e.g., greedy, dishonest, scheming), and Christians were associated with positive moral stereotypes (e.g., trustworthy, honest, generous)." Justin D. Levinson, Hon. Mark Bennett & Koichi Hioki, *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63, 105 (2017). Strikingly, the results showed federal judges were more likely to sentence a Jewish defendant to a longer sentence than an otherwise identical Christian defendant. *Id.* at 104, 105 Fig. 1, 110-11.

Another study of racial bias among jurors in capital sentencing makes an even more striking finding. Mock juror-participants who had "a higher self-reported[14] racial bias score" were more likely to "giv[e] the death penalty when the victim of the murder was White." Justin D. Levinson, Robert J. Smith, Danielle Young, *Devaluing Death*, 89 N.Y.U. L. Rev. 513, 562 (2014). In other words, explicitly biased jurors acted on those biases in their sentencing. These studies suggest, at a minimum, that judges who harbor explicit negative stereotypes about Jewish people—whether they intend to or not—likely introduce their biases into the courtroom.

For all these reasons, Judge Cunningham's participation violated Mr. Halprin's right to due process of law. Mr. Halprin's conviction and sentence must be vacated so he can be tried before an impartial tribunal.

---

[14] Participants were given the "Modern Racism Scale" which "asks participants to rate their agreement or disagreement with a series of statements, such as "Discrimination against blacks is no longer a problem in the United States." Levinson, *supra*, at 556.

# PROCEDURAL ISSUES

## I. STATEMENT OF EXHAUSTION AND STAY PENDING SUPREME COURT REVIEW

Like the habeas petitioner in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), Mr. Halprin has filed a "protective" petition to raise an unexhausted claim that he must present in federal court before the statute of limitations expires. *See* 28 U.S.C. § 2244(d)(1). Here, the fact that Judge Cunningham is a bigot—at least, that he is biased against African-Americans—came to light on May 18, 2018, when the *Dallas Morning News* published an article stating that he referred to criminal cases he presided over as "T.N.D.s" which stood for "typical nigger deals." Exhs. 21, 22. Follow-up investigation revealed Judge Cunningham's anti-Semitism, and showed the extent to which that hatred infected his thinking about Mr. Halprin.

Ordinarily, Mr. Halprin would seek a stay to exhaust his claim. *See Pace*, 544 U.S. at 416 (authorizing a habeas petitioner to "fil[e] a 'protective' petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." (citing *Rhines v. Weber*, 544 U.S. 269, 278 (2005)).

But by operation of Texas post-conviction law, Mr. Halprin may not yet return to state court. Under the Texas Court of Criminal Appeals' ("TCCA") "two-forums rule," the state court will not consider Mr. Halprin's application under Texas Code of Criminal Procedure art. 11.071, § 5 because his initial federal habeas corpus proceedings are ongoing. *Ex parte Soffar*, 143 S.W.3d 804, 804 (Tex. Crim. App. 2004) (stating rule); *Ex parte Kunkle*, No. 20,574-03, 2004 WL 7330932, at *1 (Tex. Crim. App. Sept. 15, 2004) (applying rule to dismiss subsequent application pending while petition for certiorari was pending in U.S. Supreme Court, *see Kunkle v. Dretke*, 543 U.S. 835 (Oct. 4, 2004) (mem.)).

Mr. Halprin's petition for a writ of certiorari to review the decision of the Fifth Circuit Court of Appeals is due June 12, 2019. *Halprin v. Davis*, No. 18A1032 (U.S. May 13, 2019) (application granted by Justice Alito extending time to file until June 12, 2019).

At this time, the exhaustion requirement is in a form of suspended animation: one of the statutory exceptions applies because, due to the two-forums rule, "there is an absence of available State corrective process," 28 U.S.C. § 2254(b)(1)(B)(i), but that condition is temporary. *See In re Lewis*, 484 F.3d 793, 798 (5th Cir. 2004) ("Texas two-forum rule temporarily postponed Lewis's ability to file his *Atkins* claim in state court"). Either the Supreme Court will grant review, or it will deny it. But until the Supreme Court disposes of Mr. Halprin's petition, stay and abeyance in this Court will have no effect on the availability of the Texas post-conviction review process.

The obverse also is true: the absence of an available state corrective process due to the two-forums rule means Mr. Halprin cannot toll the statute of limitations by properly filing an application for review in state court, or, at least, that there is uncertainty regarding (a) whether an application dismissed under the two-forums rule was properly filed, and (b) how long such an application would remain pending, if at all. *See* 28 U.S.C. § 2244(d)(2) (providing that limitations period is tolled during pendency of "properly filed application for State post-conviction or other collateral review"); *Pace*, 544 U.S. at 416 ("A petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court."). But for the two-forums rule, Mr. Halprin could have filed an application in state court under § 5 of Article 11.071 and relied upon that to toll the federal statute of limitations. *Mathis v. Thaler*, 616 F.3d 461, 472 (5th Cir. 2010) (application under § 5 is properly filed even if state court ultimately denies review under § 5(a)). However, as the Fifth Circuit has recognized, the *potential* application of the two-forums rule creates sufficient problems to constitute grounds for equitably tolling the statute of limitations in some

circumstances. *See In re Hearn*, 389 F.3d 122, 123 (5th Cir. 2004).[15] Until the resolution of Mr. Halprin's initial federal habeas proceedings, there is not good cause for this Court to stay and abate these proceedings because there is no state court remedy available for exhaustion. (But, as stated in the introduction and the accompanying motion, the *certiorari* petition *is* good cause for staying this matter.)

Second, similar to the petitioner in *Hearn*, Mr. Halprin is without counsel to litigate his claim in state court. Neither the Federal Public Defender nor private appointed counsel can appear under this Court's appointment in a state habeas proceeding for purposes of exhaustion absent an order from this Court authorizing that appearance. *Harbison v. Bell*, 556 U.S. 180, 190 n.7 (2009) ("Pursuant to [18 U.S.C.] § 3599(e)'s provision that counsel may represent her client in 'other appropriate motions and procedures,' a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation."). Although Mr. Mansur could file the § 5 application *pro bono publico*, Mr. Halprin would need additional counsel to litigate the matter.

In sum, Mr. Halprin's claim is now timely filed. By separate motion, Mr. Halprin will seek a stay of these proceedings pending resolution of his petition for *certiorari*, to be filed on June 12.

---

[15] The Fifth Circuit has said "Texas has overturned" its two-forums rule. *Hearn*, 389 F.3d at 123; *In re Wilson*, 442 F.3d 872, 876 (5th Cir. 2006). That is not correct. The TCCA has explained, "we *modified* our so-called "two-forums" rule in such a way that it should no longer pose a potential statute of limitations problem for federal habeas applicants raising *Atkins* claims under the provisions of the Antiterrorism and Effective Death Penalty Act." *Ex parte Blue*, 230 S.W.3d 151, 156 n.21 (Tex. Crim. App. 2007) (emphasis added). But that modification—an allowance for the federal courts' stay-abeyance procedure for petitioners who went to state court *first*, *Ex parte Soffar*, 143 S.W.3d 804 (Tex. Crim. App. 2004), was not available to Mr. Halprin who was already in the Fifth Circuit when he first could have learned of Judge Cunningham's bias. The rule remains in effect. *See, e.g.*, *Ex parte Acker*, No. WR-56,841-05, 2014 WL 2002200, at *1 (Tex. Crim. App. May 14, 2014) (dismissing under *Soffar* while case was in federal district court); *Ex parte Pondexter*, No. WR-39,706-02, 2008 WL 748393, at *1 (Tex. Crim. App. Mar. 19, 2008) (dismissing under *Soffar* while case was in Fifth Circuit).

Then, at the conclusion of his Supreme Court proceedings, Mr. Halprin will have grounds for a *Rhines* stay, so he may exhaust his claim in state court under Texas's modified two-forums rule.

## II. THE PETITION IS TIMELY

In compliance with the one-year statute of limitations, Mr. Halprin is filing this petition less than one year after due diligence could have led to the discovery of Judge Cunningham's biases and prejudices. 28 U.S.C. § 2244(d)(1)(D). The limitations period ran "from . . . . the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* Mr. Halprin's claims are predicated on the bias and prejudice that trial judge Vickers Cunningham felt towards him because he is a Jew and because he was a follower of two Latino men against whom Judge Cunningham also was prejudiced because of their ethnicity.

The earliest date on which due diligence might have triggered an investigation into Judge Cunningham's bias was May 18, 2018. On that date, the *Dallas Morning News* published an article online and posted an accompanying video revealing that former Judge Cunningham is a racist. *See* Exh. 21, Martin, *White, straight, and Christian.* In the video interview, Judge Cunningham confirmed that he set up a trust fund for his children with the condition each child would receive a distribution upon the child's marriage but only if the child married a person who was white, Christian, and of the opposite sex. Exh. 22. Judge Cunningham explained that he opposed inter-racial marriage on the basis of "my faith" and "as a Christian." *Id.* The *Morning News* asked Judge Cunningham whether he ever used the word "nigger." Judge Cunningham paused for nine seconds before asking whether the *Morning News* meant to ask whether he ever used the word in court. *Id.* Then he denied using it at all. *Id.* Judge Cunningham's brother Bill Cunningham and Bill's friend Amanda Tackett told the *Morning News* that the judge did use the word, including that he referred to court cases he presided over as "TNDs" which stood for "typical nigger deals." Bill's husband, who is Black, also

reported that Judge Cunningham referred to him as "boy." Exh. 21, Martin, *White, straight, and Christian.*

The *Morning News* focused on Judge Cunningham's prejudice against black people. None of the so-called "Texas Seven" co-defendants was black, and, therefore, due diligence did not require Mr. Halprin to investigate whether Judge Cunningham was biased against him because he is Jewish. In an abundance of caution, Mr. Halprin investigated whether Judge Cunningham's opposition to his children marrying non-Christians might be based on a bias against Jews.

That investigation produced evidence of Judge Cunningham's deep-seated prejudices and their influence on his desire to be a prosecutor and judge, and his actions in those roles. Among other things, the investigation produced evidence that Judge Cunningham was prejudiced against Jews, that he referred to his daughter's Jewish boyfriend as "Jew boy" before compelling her to end her relationship with him, that Judge Cunningham used stereotypes and anti-Semitic tropes like "Jew banker" when speaking of Jews, and that when describing his role in the Texas Seven trials, he referred to Mr. Halprin as the "goddamn kike," and "the fuckin' Jew," and to his Latino co-defendants as "wetbacks." Mr. Halprin also learned about the actions Judge Cunningham would take in order to conceal his bigotry, for example, by donning a tie he thought would be appealing to an African-American audience but that he referred to as his "nigger tie" behind their backs. Mr. Halprin also learned that Judge Cunningham's prejudices motivated him to seek public office, for example, that he ran for public office in order to "save Dallas from niggers, wetbacks, Jews, and dirty Catholics."

Before the *Morning News* exposed Judge Cunningham's bigotry on May 18, 2018, and even afterwards, no investigation was called for under the due diligence standard. There is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The Supreme Court has said that presumption operates in the specific context of an inquiry into a

claim of judicial bias. *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (considering whether discovery should be made available to capital habeas petitioner alleging judicial bias: "Ordinarily, we presume that public officials have properly discharged their official duties.") (internal quotation marks and citations omitted). That is, Mr. Halprin and his counsel were entitled to presume that Judge Cunningham was not biased or prejudiced against Jews and Latinos even after the *Morning News* exposed his bigotry towards blacks and homosexuals. They investigated anyway and discovered the evidence presented here less than one year later.

### III.  THE PETITION IS NOT A "SECOND OR SUCCESSIVE" PETITION

This case presents a threshold issue: how to interpret § 2244(b)(2)'s triggering phrase "second or successive" when the habeas petitioner presents a constitutional claim that meets the statutory criteria for timeliness but "does not fit within either of subsection (b)(2)'s exceptions." *Stewart v. Martinez-Villareal*, 523 U.S. 637, 642 (1998). Section 2244(b)(2)[16] only applies to "second or successive" petitions, but "that phrase does not simply 'refe[r] to all § 2254 applications filed second or successively in time.'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Panetti v.*

---

[16] Section 2244(b)(2) serves a "gatekeeping provision" for habeas petitions filed in federal court. *Felker v. Turpin*, 518 U.S. 651, 657 (1996). As relevant here, it instructs that,

> [a] claim presented in a *second or successive habeas corpus application* under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> **(A)** the applicant shows that the claim relies on a new rule of constitutional, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> **(B)**(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b) (emphasis added).

*Quarterman*, 551 U.S. 930, 940 (2007)). As the Supreme Court has done in less compelling circumstances, this Court should not treat Mr. Halprin's judicial bias claim as "second or successive" for the purpose of triggering § 2244(b) by taking into account (1) the recognized purposes of the abuse-of-writ statute, (2) the practical effects of requiring compliance with § 2244(b), (3) Congress' intent in passing the law, and (4) the parties' equitable positions under Supreme Court law.

This case has two features in common with *Panetti* and *Martinez-Villareal*—the two cases in which the court concluded § 2244(b) should not apply to a second-in-time petition. First, the factual predicate for Mr. Halprin's claim was not previously available. *See also* 28 U.S.C. § 2244(b)(2)(B)(i) (codifying Congress' desire that only previously unavailable claims be considered after initial habeas review). Second, as applied to Mr. Halprin, the statute purports to withdraw jurisdiction over a timely filed petition raising a fundamental and long-established constitutional right, the right to an impartial trial judge. *Cf.* 28 U.S.C. § 2244(b)(2)(B)(ii). Judicial bias claims, like the competency-to-be-executed claims raised in *Panetti* and *Martinez-Villareal,* are incompatible with the statute because they do not depend on the factfinders' assessment of guilt.[17] *Tumey v. Ohio,* 273 U.S. 510, 535 (1927) ("No matter what the evidence was against him, he had the right to have an impartial judge"). In *Panetti* and *Martinez-Villareal,* the Supreme Court held *Ford* [18] claims were not "second and successive" *because* the statute's exceptions failed to recognize them, *see Panetti,* 551 U.S. at 943-46, not despite it. This Court should do the same.

---

[17] Mr. Halprin *can* show that he is actually innocent of the death penalty because his culpability is constitutionally insufficient to subject him to capital punishment under *Enmund v. Florida,* 458 U.S. 782 (1982), and *Tison v. Arizona,* 481 U.S. 137 (1987). Were Mr. Halprin attempting to get review of a procedurally defaulted claim, or to present an initial petition outside the statutory limitations period, his freestanding showing of innocence would suffice. *See Sawyer v. Whitley,* 505 U.S. 333 (1992); *McQuiggin v. Perkins,* 569 U.S. 383, 392-93 (2013).

[18] *Ford v. Wainwright,* 477 U.S. 399 (1986).

Mr. Halprin's claim is far more compelling than those in *Panetti* and *Martinez-Villareal*, because his evidence shows the entire trial was fundamentally unfair. Like other structural errors, a judicial bias claim is a "structural defect[] in the constitution of the trial mechanism" and "the presence on the bench of a judge who is not impartial" "obviously" affects "the entire conduct of the trial from beginning to end." *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). By contrast, a *Ford* claim questions only the *timing* of a lawfully imposed death sentence. If a petition challenging only the timing of an execution is cause to find a petition is not "second or successive," then it would be an anomalous and perverse result to hold the statute permissibly withdraws jurisdiction over a petition that challenges a structural defect in the entire trial. *See Panetti*, 551 U.S. at 943.

The Supreme Court has made clear that AEDPA should be interpreted in light of its "practical effects." *Panetti*, 551 U.S. at 945. "This is particularly so when petitioners 'run the risk' under the proposed interpretation of 'forever losing their opportunity for any federal review of their unexhausted claims.'" *Id.* at 945-46 (quoting *Rhines v. Weber*, 544 U.S. 269, 275 (2005)). Because "'closing the door to'" petitioners raising newly-discovered claims of judicial bias leads to grave problems, "'troublesome results,'" and "'procedural anomalies,'" this Court should avoid that interpretation of AEDPA unless it has "'clear indication that such was Congress' intent.'" *Id.* at 946 (quoting *Castro v. United States*, 540 U.S. 375, 380, 381 (2007)).

### A. Supreme Court Precedent Forecloses Automatically Treating this Petition as "Second or Successive."

"It is well settled that the phrase 'second or successive' does not simply 'refer to all § 2254 applications filed second or successively in time.'" *Magwood*, 561 U.S. at 332 (internal quotation marks, citation, and alterations omitted). Because the phrase is "not self-defining," "[i]t takes its full meaning from [Supreme Court] case law, including decisions predating the enactment of [AEDPA]." *Panetti*, 551 U.S. at 943-44. Accordingly, the Court "has declined to interpret 'second or successive'

as referring to all § 2254 applications filed second or successive in time, even when the later filings address a state-court judgment already challenged in prior § 2254 application." *Id.* at 944.

In both *Panetti* and *Martinez-Villareal*, the Court considered the practical effects of its holdings and rejected an interpretation that would exclude any federal review of those claims because "the implications for habeas practice would be far reaching and seemingly perverse." *Martinez-Villareal*, 523 U.S. at 644; *see also Panetti*, 551 U.S. at 943-46. With those considerations in mind, the Court "create[d] an 'exception' to § 2244(b) for a second application raising a claim that would have been unripe had the petitioner presented it in his first application." *Magwood*, 561 U.S. at 332.

In *Panetti*, the State of Texas argued that, to avoid application of § 2244(b), and certain dismissal of his claim, Mr. Panetti should have filed his *Ford* claim in his first petition. 551 U.S. at 943. But the Court rejected this contention in part because of "the results it would produce." *Id.* A prisoner would either have to forgo the opportunity to raise such a claim in federal court, or raise the claim in a first petition, even though it was premature. *Id.* This "dilemma would apply not only to prisoners with mental conditions indicative of incompetency," who might contemplate a future *Ford* claim, "but also to those with no early signs of mental illness," who may have no reason to believe that such a claim would become applicable. *Id.* The State's demand for premature claims "would add to the burden imposed on courts, applicants, and the States, with no clear advantage to any." *Id.* In order to avoid that result, the Court concluded that "Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture" presented in Mr. Panetti's case. *Id.* at 945. The fact that Congress has not further amended AEDPA in the 21 years since *Martinez-Villareal*, or the 12 years since *Panetti*, indicates the Supreme Court was correct that Congress did not intend to foreclose claims that have no bearing on guilt or innocence.

46

And Congress did not intend § 2244(b) to govern a filing in the unusual posture presented here: a § 2254 petition raising a judicial bias that could only have become available later, by happenstance. It makes no more practical sense to require the pleading of judicial bias claims without a factual predicate than to require the pleading of incompetency claims without a factual predicate.

What is more, just as a "State . . . may properly presume that [a] petitioner remains sane at the time sentence is to be carried out," *Ford*, 477 U.S. at 426 (Powell, J., concurring), there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *accord Bracy*, 520 U.S. at 909. The Supreme Court has repeatedly held that habeas petitioners are entitled to rely upon presumptions of official integrity such that diligence imposes no duty to investigate where there is no evidence official wrongdoing. *See Banks v. Dretke*, 540 U.S. 668, 694 (2004) ("it was . . . appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct") (citing *Strickler v. Green*, 527 U.S. 263, 285-89 (1999)).

This Court should follow *Martinez-Villareal* and *Panetti* because like the "unusual posture presented" in *Panetti*, 551 U.S. at 945, "[t]he facts of this case are, happily, not the stuff of typical judicial disqualification disputes," *Bracy*, 520 U.S. at 905, and the evidence of a structural defect in the state court judgment was not previously available through diligent inquiry. Congress could not account for every potential claim that might come to light after an initial petition. It is reasonable to conclude Congress simply assumed something as rare as a racially biased judge would not require specific mention in the Act.[19]

---

[19] Since its enactment, AEDPA has required an unusual amount of judicial construction and interpretation and has produced extraordinary divisions among judges over its meaning and application. There are many reasons. One "is that in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting." *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

**B. Dismissing Mr. Halprin's Judicial Bias Claim Would Have Far-Reaching and Perverse Implications**

Congress could not have intended for § 2244(b) to deprive a petitioner in Mr. Halprin's situation of a federal habeas remedy, given its overarching commitment to retaining a remedy for claims impacting the fundamental fairness of a criminal trial. "Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859 (1994), *quoted in Christeson v. Roper*, 135 S. Ct. 891, 894 (2015). *Martinez-Villareal* and *Panetti* are in line with other cases preserving federal habeas review for claims that impact the fundamental fairness of a death sentence. *See, e.g., Teague v. Lane*, 489 U.S. 288, 312 (1989) (explaining exception to rule against retroactive application of new rules for claims that "implicate the fundamental fairness of the trial"); *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (discussing role of fundamental fairness in second *Teague* exception). *Martinez-Villareal*'s construction of AEDPA also promotes the federal courts' proper role in ensuring "the 'laws, rules, and remedies' created by Congress" comport with the Constitution's demand for a remedy. *Chapman v. California*, 386 U.S. 18, 47 (1967) (Harlan, J., dissenting).

Indeed, one of the intellectual architects of § 2244(b)(2)(B)'s innocence exception, Judge Henry Friendly, argued that an innocence requirement should not apply in cases where "the criminal process itself has broken down; the defendant has not had the kind of trial the Constitution guarantees." Henry Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 151 (1970); *see also id.* (arguing that another structural error, racial discrimination in jury selection, should not be subject to innocence requirement). Like the claims excluded by Judge Friendly, Mr. Halprin's judicial bias claim concerns "the very basis of the criminal

process," such that collateral attack would be appropriate "regardless of the defendant's guilt." *Id.* at 152.

Given Congress's consistent focus on fundamental fairness, Mr. Halprin has a far stronger claim to federal habeas review than the petitioners in *Martinez-Villareal* and *Panetti* had, because his claim so directly implicates the structural integrity of his trial.

The right to be tried by an impartial judge is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman,* 386 U.S. at 23 & n.8 (citing *Tumey,* 273 U.S. 510). Even Justice Harlan, who dissented in *Chapman,* said, in words that carry greater importance in the present case, that he considered judicial bias among those "certain types of official misbehavior [that] require reversal simply because *society cannot tolerate giving final effect to a judgment tainted with such intentional misconduct.*" 386 U.S. at 56 & n.7 (Harlan, J., dissenting) (emphasis added). "Since fundamental fairness is the central concern of the writ of habeas corpus," *Strickland v. Washington,* 466 U.S. 668, 697 (1984), the exclusion of Mr. Halprin's claim from federal review would have more far reaching and perverse implications than the exclusionary application of § 2244(b) that was rejected in *Panetti* and *Martinez-Villareal.*

The claim at issue in *Panetti* and *Martinez-Villareal,* while substantial, was not as weighty as Mr. Halprin's judicial bias claim. As Justice Powell observed when considering how much process was due to one claiming incompetence for execution, a *Ford* incompetency-for-execution claim concerns only the timing of the execution, not whether it may happen at all. *Ford,* 477 U.S. at 425 ("This question [of when the execution may take place] is important, but it is not comparable to the antecedent question whether the petitioner should be executed at all.") (Powell, J., concurring). Nothing could implicate the fundamental fairness of the trial more than evidence that an anti-Semitic judge harbored animus against a Jewish defendant in his capital trial.

Mr. Halprin's claim is at least as serious as the claim presented in *Buck v. Davis*, 137 S. Ct. 759 (2017). *Buck* reaffirmed the role of federal habeas courts in eliminating racial prejudice from the administration of justice, and doing so long after the entry of final judgment in an initial federal habeas petition challenging a Texas death sentence. *Id.* at 778.

In *Buck*, defense counsel unreasonably elicited from his penalty-phase expert the opinion that there was a "connection between Buck's race and the likelihood of future violence," specifically, that his race meant there was an "[i]ncreased probability" that he would commit future acts of violence. *Buck*, 137 S. Ct. at 775. The Supreme Court held the testimony was prejudicial in part because "the focus of the proceeding was on the first question" presented to the jury: future dangerousness. *Id.* at 776. Although Buck "had committed acts of terrible violence," they "occurred outside of prison, and within the context of romantic relationships with women." *Id.* So the question was whether the change in setting if he were sentenced to life imprisonment "would minimize the prospect of future dangerousness." *Id.* The expert's testimony was prejudicial in large part because it focused on "one thing would never change: the color of Buck's skin." *Id.* As the Supreme Court said, that claim is far from "*de minimis*," as the district court had held it was. *Id.* at 777.

From jury selection, and the life- and death-qualifying of jurors,[20] through ruling on objections and other informal responses to testimony and argument in the courtroom, the purpose of judging in a capital trial is to ensure that if and when the time comes, jurors will be able "to make a 'highly subjective, unique, and individualized judgment'" on the right sentence. *Turner v. Murray*, 476 U.S. 28, 33-34 (1986). The potential for improper influence in those circumstances by a judge who could

---

[20] *See Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) (explaining life-qualification); *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (explaining death-qualification).

not himself view the defendant as Randy Halprin, unique human being, but only "the fuckin' Jew" or "goddamn kike," is incalculable.

It would have far reaching implications and would be truly perverse to dismiss Mr. Halprin's evidence that the trial judge considered him a "goddamn kike" and "that fuckin' Jew" after the Supreme Court permitted the *Ford* claim to proceed in *Panetti,* and granted relief on Buck's ineffective-assistance-of-counsel claim that involved a single witness testifying to a racial stereotype. As the Supreme Court recently observed, "the public legitimacy of our justice system relies on procedures that . . . provide for error correction," *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). Correcting constitutional error is not just a matter of reputation, it is a matter of efficacy.

> Legitimacy may be measured by the quality of decision making or the quality of treatment of defendants. More specifically, procedures are legitimate when they are neutral, accurate, consistent, trustworthy, and fair—when they provide opportunities for error correction and for interested parties to be heard. Legal authorities are legitimate when they act impartially, honestly, transparently, respectfully, ethically, and equitably. The criminal justice system that optimally expresses these values is not only morally defensible but also quite probably stable and effective.

Bowers & Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*, 47 Wake Forest L. Rev. 211, 215–216 (2012), *cited in Rosales-Mireles*, 138 S. Ct. at 1908. Mr. Halprin's judicial bias claim raises precisely these practical concerns.

As evidence that public confidence has already been shaken by reports of Judge Cunningham's racist values, one need only read the reactions of readers to the May 18, 2018, *Dallas Morning News* report. In response to a tweet linking to the article on Twitter, dozens of users commented that Cunningham's conduct caused them to question his ability to preside over cases fairly. See Twitter Comments to *Dallas Morning News* Tweet of May 18 Article (Exhibit 30). Emblematic was @BeBraveNStuff who said, "I cannot be the only person wondering how many people of color this unashamed bigot had before him in a court room. Every case this man judged

should be under scrutiny." Exh. 30, https://twitter.com/BeBraveNStuff/status/997657752968327168 (liked 58 times).

This Court should avoid the troublesome, anomalous, and review-foreclosing interpretation of § 2244(b) that would preclude consideration of a claim attacking the integrity of the trial process at its foundation, where less serious claims would get consideration under similar circumstances.

### C.  Equity Provides the Appropriate Remedy

Section 2244(b) imposes "a restraint on what is called in habeas corpus practice 'abuse of the writ.'" *Felker v. Turpin*, 518 U.S. 651, 664 (1996). In *Felker*, the Supreme Court found the statute was "within the compass of" that doctrine that, in turn, was "'a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions.'" *Id.* (quoting *McClesky v. Zant*, 499 U.S. 467, 489 (1991)). *Panetti* and *Martinez-Villareal* are further steps in that evolutionary process. Mr. Halprin proposes this Court find that consideration of his judicial bias claim is on the path from *McClesky* to AEDPA to *Panetti*. For the reasons stated in the previous section, Mr. Halprin's claim does not require this Court to go beyond *Panetti*, but rather to find that because review was required for a *Ford* claim, which does not concern the structural integrity of the trial, it is necessarily required for a bias claim, which does show a lack of structural integrity.

Section 2244(b) does not impair this Court's equitable power to decide a case in a manner consistent with *Panetti*. "[E]quitable principles have traditionally governed the substantive law of habeas corpus," and the Supreme Court "will not construe a statute to displace courts' traditional equitable authority absent the clearest command." *Holland v. Florida*, 560 U.S. 631, 646 (2010). The text of § 2244(b) contains no clear command countering the courts' equitable authority to permit review of a claim of judicial bias, the factual basis of which was not available until after May 18, 2018.

"In habeas, equity recognizes that 'a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks.'" *McClesky*, 499 U.S. at 490 (quoting *Sanders v. United States*, 473 U.S. 1, 17 (1963)). The Supreme Court also has held that when a federal court decides whether to apply the procedural default doctrine, it is appropriate to consider whether *the State's* conduct diminishes its ability to rely upon that habeas defense. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (explaining that *Martinez v. Ryan*, 566 U.S. 1 (2012) "announced a narrow[] 'equitable . . . qualification' of" the procedural default rule); *id.* at 2068 ("*Martinez* . . . was responding to an equitable consideration" raised by state law). The *Martinez* Court held in part that the State's deliberate choice regarding the manner of review of federal claim was "'not without consequences for the State's ability to assert a procedural default' in subsequent federal habeas proceedings." *Id.* at 2068 (quoting *Martinez*, 566 U.S. at 13).

Because "[t]he doctrines of procedural default and abuse of the writ implicate nearly identical concerns flowing from the significant costs of federal habeas corpus review," *McClesky*, 499 U.S. at 490-91, "the same standard used to determine whether to excuse state procedural defaults should govern the determination of inexcusable neglect in the abuse-of-the-writ context," *id.* at 490. In the procedural default context, the cause inquiry parallels the due-diligence requirement under § 2244(b)(2). It focuses on "objective factors external to the defense" in order to distinguish the circumstances that can constitute cause from "a 'tactical' or 'intentional' decision to forgo a procedural opportunity" to raise a federal claim because such a decision "normally cannot constitute cause." *Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988) (quoting *Reed v. Ross*, 468 U.S. 1, 14 (1984)). In *Amadeo*, the Court found cause where local officials concealed the factual basis for the petitioner's claim. *Id.* at 222.

As shown above, the law recognizes a presumption of honesty and integrity for both prosecutors and judges, and would-be claimants like Mr. Halprin are entitled to rely on those

presumptions. When evidence shows that prosecutors failed to live up to the presumption of integrity, by suppressing evidence and claiming that they disclosed it, the prisoner has cause for his failure to raise a *Brady* claim in state court. *Banks*, *supra*, 540 U.S. at 692-93, discussing *Strickler*, *supra*, 527 U.S. at 276-289. The same principle should apply here.

Judge Cunningham had a duty not to preside over a case in which he considered the defendant a "kike" and "fucking Jew," and whose co-defendants he thought of as "wetbacks." *See* Claim 1.B.1, *supra*, at 29 (discussing Texas authority for duty to recuse). By remaining on the case, and not disqualifying himself, Judge Cunningham, like the prosecutors in *Banks* and *Strickler*, violated Mr. Halprin's right to due process and concealed the factual basis for asserting that his rights were violated.

Section 2244(b), like the Supreme Court's abuse-of-the-writ cases, attempts to relieve the burden imposed when "a State must defend its conviction in a second or subsequent habeas proceeding on grounds not even raised in the first petition." *McClesky*, 499 U.S. at 492. But as the Court held in *Martinez*, albeit in different circumstances, that concern has no weight, or the State is not entitled to press its concern, when, as in *Banks* and *Strickler*, a state actor—here a judge specially appointed to preside over the Texas Seven trials—suppressed or concealed the relevant information and thereby prevented his conduct from being challenged earlier and thereby caused the constitutional claim to be filed in a second petition.

AEDPA, as interpreted in *Panetti*, does not require that the State's interest in finality be given weight here, and equity forbids it. Public confidence in the legitimacy and integrity of the criminal justice system requires federal habeas review as a means of correction for this capital trial tainted by

a racist judge who had actual anti-Semitic and anti-Latino bias against the defendants. Accordingly, this Court should hold this petition is not subject to § 2244(b)'s restrictions.[21]

## REQUEST FOR PROCEDURES AVAILABLE UNDER STATUTES AND RULES

The habeas statutes and rules, and the cases applying them, "reduce uncertainty, avoid unfair surprise, minimize disparate treatment of similar cases, and thereby help all litigants, including the State, whose interests in 'finality' such rules often further." *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996). That is, the statutes and rules provide for due process in habeas proceedings. Ad hoc departures from those processes for purposes of expediency may violate due process. *See id.* at 320-22. Mr. Halprin requests this Court afford him the procedures set forth in 28 U.S.C. § 2243, paragraphs 6 and 7, and Habeas Rules 5(e), 6, 7, and 8. Filing the traverse or reply under § 2243 and Habeas Rule 5(e) completes the pleading stage, *Walker v. Johnston*, 312 U.S. 275, 284 (1941) ("petition and traverse ... should be [treated] as together constituting the application for the writ"),[22] and this Court will be able to determine whether discovery is required because Mr. Halprin has placed specific allegations before the Court that may entitle him to relief if they are fully developed. *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). After that determination, the Court will be in a position to determine whether the record should be expanded, Habeas Rule 7(a), after which point Habeas Rule 8(a) requires a habeas court to consider whether, in light of "any materials submitted under Rule 7 ... an evidentiary hearing is warranted." *See Wellons v. Hall*, 558 U.S. 220, 226 (2010)

---

[21] These equitable and practical reasons would also support relief from the judgment under Federal Rule of Civil Procedure 60(b). Rule 60(b) serves as "a grand reservoir of equitable power to do justice in a particular case that may be tapped by the district court in the sound exercise of its discretion, and within the strictures inherent in the underlying objectives of the rule." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981) (internal quotations and citations omitted). Moreover, "there can be little doubt that Rule 60(b) vests in the district courts power 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.'" *Id.* at 401 (quoting *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949)).
[22] *See also* 28 U.S.C. § 2248; Habeas Rule 8(a).

(per curiam); *Townsend v. Sain*, 372 U.S. 293, 312-19 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

To the extent this Court may find the State met its pleading burden related to procedural defenses such as non-exhaustion, the application of 28 U.S.C. § 2254(d)(1) or (d)(2) to specific items of evidence, or procedural default, this Court should grant a hearing so that Mr. Halprin can present evidence in support of avoidance, traverse, or exceptions to those defenses. *See Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980); *see also Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013); *Schlup v. Delo*, 513 U.S. 298, 332 (1995); *Gallow v. Cooper*, 570 U.S. 933 (June 27, 2013) (Breyer, J.) (statement regarding denial of *certiorari*).

Although the State has the right to answer, and Mr. Halprin has a right to complete his application by way of reply and traverse, the allegations here are sufficient to trigger the fact-development procedures in Habeas Rules 6, 7, and 8.

## PRAYER FOR RELIEF

For the foregoing reasons, Petitioner respectfully prays that this Court:

a. Stay these proceedings and hold them in abeyance pending Supreme Court review of Petitioner's initial federal habeas proceedings;

b. Under 28 U.S.C. § 2243, ¶ 5, issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in this Petition;

c. Under § 2243, ¶ 1, or Habeas Rule 4, direct the State to answer or show cause why relief should not be granted;

d. Under § 2243, ¶ 6, and Habeas Rule 5(e), allow Petitioner to deny or allege additional facts, and respond to any procedural defenses, by way of traverse or reply;

e. Under Habeas Rule 6, allow Petitioner an opportunity to file a motion for discovery, and, under § 2243, ¶ 7, and Fed. R. Civ. P. 15(a)(2), permit Petitioner an opportunity to seek leave to amend with any newly discovered evidence;

f. Under Habeas Rule 7, allow Petitioner an opportunity to suggest that the record be expanded;

g. Under Habeas Rule 8, conduct an evidentiary hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in his Petition;

h. Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by his Petition;

i. Direct the parties to brief and argue any issues that may arise in the course of the litigation;

j. Grant such other relief as may be necessary and appropriate.

DATED:  May 17, 2019                    Respectfully submitted,


MAUREEN FRANCO                          /s Paul E. Mansur
Federal Public Defender                 PAUL E. MANSUR
Western District of Texas               Texas Bar No. 24053310
                                        P.O. Box 1300
s/ Tivon Schardl                        Denver City, Texas 79323
TIVON SCHARDL                           (806) 592-2797 (tel.)
Chief, Capital Habeas Unit              (806) 592-9136 (fax)
Florida Bar No. 73016                   paul@paulmansurlaw.com
s/ Timothy Gumkowski
TIMOTHY GUMKOWSKI
Assistant Federal Defender
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org
Tim_gumkowski@fd.org                    Counsel for Randy Ethan Halprin

## VERIFICATION BY ATTORNEY

I, the undersigned, am the attorney appointed by this Court under 18 U.S.C. § 3599 to represent Petitioner Randy Ethan Halprin in these proceedings. Under that appointment, I have met with Mr. Halprin on several occasions, consulted with his co-counsel, Paul Mansur, and retained and directed experts and investigators to inquire into the circumstances surrounding judgments of conviction and death imposed on Mr. Halprin by the State of Texas. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on May 17, 2019.

Subscribed to by me this 17th day of May 2019 in Miami, Florida.


*/s/ Tivon Schardl*

Tivon Schardl

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May, 2019, I electronically filed the foregoing Petition for Writ of Habeas Corpus Supported by Points and Authorities with the Clerk of Court using the CM/ECF system which will effect service on all counsel of record.


*/s/ Timothy Gumkowski*
TIMOTHY P. GUMKOWSKI