IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RANDY ETHAN HALPRIN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civ. Act. Nos.  3:13-CV-1535-L |
| | § | 3:19-cv-1203 |
| LORIE DAVIS, Director, | § | *Death Penalty Case* |
| Texas Department of Criminal | § | |
| Justice Correctional Institutions, | § | |
| Division, | § | |
| Respondent. | § | |

**RESPONDENT'S MOTION TO DISMISS SUCCESSIVE PETITION
WITH BRIEF IN SUPPORT**

Petitioner Randy Halprin was properly convicted and sentenced to die

for the murder of Irving Police Officer Aubrey Hawkins. Halprin filed his

federal habeas petition in 2014, which this Court denied in 2017. Docket Entry

(DE) 15, 49, 50. The Fifth Circuit denied Halprin's application for a certificate

of appealability (COA). *Halprin v. Davis*, 911 F.3d 247, 260 (5th Cir. 2018).

Halprin's petition for a writ of certiorari is due to be filed with the Supreme

Court by June 12, 2019. *Halprin v. Davis*, No. 18A1032. Halprin has now filed

in this Court a successive habeas petition challenging the same presumptively

valid conviction and sentence pursuant to 28 U.S.C. § 2241 & 2254. DE 58.

Halprin's successive petition raises one claim alleging his right to due process

was violated by judicial bias. DE 58 at 21–38.

Halprin's petition is successive because it challenges the same judgment he previously challenged in this Court, and his claim does not fall within an exception under 28 U.S.C. § 2244(b)(2). Accordingly, the Director respectfully requests that this Court grant the Director's Motion to Dismiss.

## HALPRIN'S CLAIM

Halprin alleges that his right to due process was violated because his trial judge harbored anti-Semitic bias. As demonstrated below, Halprin's claim is impermissibly successive.

## STATEMENT OF THE CASE

Halprin was convicted and sentenced to death for the murder of Officer Hawkins. I Clerk's Record (CR) 48–53, 65. The Texas Court of Criminal Appeals (CCA) affirmed Halprin's conviction and sentence on direct appeal. *Halprin v. State*, 170 S.W.3d 111 (Tex. Crim. App. 2005).

Halprin filed a state application for a writ of habeas corpus in the trial court raising thirty-one claims for relief. *Ex parte Halprin*, No. 77,175-01; I SHCR 2–274.[1] Following five evidentiary hearings, the trial court recommended relief be denied. VI SHCR 2558–723. The CCA adopted the trial court's findings and conclusions—with the exception of five findings and

---

[1]   "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court.

conclusions—and denied relief. *Ex parte Halprin*, No. 77,175-01 thru -04, 2013 WL 1150018 (Tex. Crim. App. March 20, 2013) (unpublished order).

Halprin then filed an initial—followed by an amended—federal habeas petition in this Court. DE 5, 15. This Court denied relief, an evidentiary hearing, and a COA. DE 49. The Fifth Circuit denied Halprin's application for a COA. *Halprin v. Davis*, 911 F.3d at 260. Following extensions of time, Halprin's petition for a writ of certiorari is due to be filed with the Supreme Court by June 12, 2019. *Halprin v. Davis*, No. 18A1032.

On May 17, 2019, Halprin filed in this Court a successive federal habeas petition and, later, a motion requesting a stay of this Court's proceedings.[2] DE 58, 62. The instant Motion to Dismiss follows.

## STATEMENT OF FACTS

### I.    Facts of the Crime

On December 13, 2000, Halprin and six other inmates—George Rivas, Larry Harper, Joseph Garcia, Donald Newbury, Patrick Murphy, and Michael Rodriguez—escaped from TDCJ's Connally Unit near Kenedy, Texas. 44 RR 118–19.[3] The group—the Texas Seven—stole sixteen firearms and ammunition

---

[2]    The Director will separately respond to Halprin's motion seeking a stay of this Court's proceedings.

[3]    "RR" refers to the Reporter's Record of transcribed trial proceedings and is preceded by volume number and followed by page numbers. "SX" refers to the State's

from the prison and fled to Dallas, committing armed robberies along the way to finance their flight. 44 RR 119–22; 48 RR 7–10. On Christmas Eve, the escapees robbed an Oshman's Supersports store in Irving, Texas. The group planned the robbery in meticulous detail, sending Halprin and Rodriguez to case the store the day before. 42 RR 38; SX 931. On the day of the Oshman's robbery, the escapees entered the store just before closing time. 42 RR 39; SX 931. Halprin, Garcia, Newbury, and Rodriguez pretended to be customers. 42 RR 39–40; 48 RR 10–11; SX 931. Rivas and Harper entered the store disguised as security officers investigating a string of thefts at another store. 41 RR 77–80; 42 RR 39; 48 RR 11; SX 931. Murphy stayed outside, monitoring the police frequencies and acting as a lookout. All the men were armed with stolen firearms. 41 RR 87, 118–19; 42 RR 40; 48 RR 13–14; SX 931.

The escapees ushered the employees at gunpoint to the break room where the men forced them to kneel, facing the wall. 41 RR 91–94, 105; 42 RR 40; 48 RR 15–16; SX 931. After binding the employees, the escapees stole the employee's personal belongings, more than $70,000 in cash, forty-four firearms, miscellaneous ammunition, and other clothing and equipment. 41 RR 96–104, 120–23; 42 RR 40–41; SX 47–49, 931. An employee's girlfriend, who

---

exhibits followed by exhibit number and page numbers where applicable. "DX" refers to the Defense's exhibits, and again is followed by exhibit number and page numbers where applicable.

4

was parked outside the store, saw the commotion inside the store and eventually called the police. 42 RR 113–23. Four units were dispatched to the scene. 42 RR 56; SX 61, 756. Having just finished dinner with his wife, son, and mother at a restaurant across the highway from Oshman's, Irving Police Officer Aubrey Hawkins was the first officer to arrive at the scene. 41 RR 54–61; 48 RR 17–25.

Still acting as lookout, Murphy radioed Rivas to warn him there was a police squad car driving through the parking lot. 41 RR 107; 42 RR 40–41; 48 RR 17; SX 931. As the escapees were exiting the back of the store, Officer Hawkins pulled in behind the escapees' get-away vehicle. 41 RR 107; 42 RR 41; 48 RR 21-22; SX 931. Before Officer Hawkins could stop his car or unholster his firearm, the escapees opened fire on the police cruiser. 42 RR 41; 48 RR 21–25; SX 931. Officer Hawkins suffered eleven gunshot wounds fired by at least five different guns. 43 RR 5–7, 67–68; 46 RR 86–99; 48 RR 25–26. Officer Hawkins was then pulled from his patrol car and left on the pavement. Fleeing the scene, the men backed their Ford Explorer get-away vehicle over Officer Hawkins, dragging him several feet. 43 RR 41–60, 44 RR 65–66, 111–12; SX 174, 174B. The men fled before the other officers arrived at the scene. 41 RR 167–75.

Minutes later Officer Timothy Cassout arrived at the scene and unsuccessfully tried to revive Officer Hawkins. 41 RR 167–75. Police secured the area, interviewed the employees, and collected evidence. Later that night, several of the employees identified the Texas Seven from a photographic lineup. 41 RR 116–18. Police also found one of the firearms stolen from the Connally Unit on the ground by the loading dock. 41 RR 178; 42 RR 10, 27–28; 43 RR 63–64; SX 39, 178. Officer Hawkin's gun was missing from his holster. 42 RR 10.

The seven escapees regrouped at a local motel and then fled to Colorado, where they purchased an RV and a Jeep. 42 RR 42; 48 RR 31–37; SX 931. Posing as traveling missionaries, the escapees rented a space at the Coachlight Motel and RV Park in Woodland Park, Colorado. 42 RR 28–32; 44 RR 128–33. On January 21, 2001, almost a month after the robbery and murder, a resident of the RV park recognized Rivas and Rodriguez from the television show "America's Most Wanted" and alerted the authorities, who quickly converged on the area. 44 RR 142–54; 45 RR 6–13. The next day law enforcement officers captured five of the seven escapees. Rivas, Garcia, and Rodriguez were captured by a Colorado SWAT team when they left the RV park in the Jeep and stopped at a gas station just off the highway. 45 RR 13–14, 35, 47–60, 92–97. Other law enforcement officers surrounded the escapees' RV where Halprin

and Harper were waiting. 45 RR 14–19, 33; 48 RR 41–42. Halprin surrendered; Harper committed suicide by shooting himself twice in the chest. 45 RR 16–19, 36–41; 48 RR 42. Two days later, police captured the remaining two escapees, Murphy and Newbury, after a standoff at a Colorado Springs hotel. 42 RR 43.

A search of the escapees' RV and Jeep uncovered Officer Hawkin's handgun and the firearms stolen from the Oshman's and the Connally Unit. 45 RR 110; SX 62. The agents also recovered other evidence connected to the prison escape and the murder, including: personal belongings of Oshman's employees; thousands of dollars in cash; ammunition; smoke grenades; rifle scopes; and a receipt for four ballistic vests purchased just days before by Rivas. 46 RR 10–48, 73–77; 47 RR 46; 49 RR 17–18. Police also found two-way radios, scanners, and radio frequency guides for both Texas and Colorado. 46 RR 10–48, 73–77. The frequencies used by the Irving Police Department were marked. 46 RR 28–29.

When interviewed at the Teller County Jail in Colorado, Halprin, Rivas, Rodriguez, and Newbury confessed to the robbery.  42 RR 32–42; 47 RR 11–12; DX 25–27; SX 931. In his statement, Halprin admitted to voluntarily participating in the armed robbery, but claimed that he never fired his gun and was, therefore, less culpable than the rest of his accomplices. 42 RR 37–42; SX 931. Halprin's confession, as well as those of his accomplices, were admitted

into evidence at his trial. 42 RR 37, 84–85; DX 25–27; SX 931. At trial, the defense tried to minimize Halprin's culpability by presenting evidence that Halprin was the youngest and least intelligent of the escapees, had no past experience with guns or a history of robbery, and lacked leadership abilities. 47 RR 87–88; 51 RR 118, 126; DX 55, 56. Halprin also attempted to minimize his participation in the escape and robbery by testifying on his own behalf. 47 RR 97–98; 48 RR 39–40, 50–51. When pressed during cross-examination, however, Halprin admitted that he successfully manipulates people with his lies, continues to lie, and often lies for no reason at all. 48 RR 59–60, 74–75, 101–04, 108, 131; 51 RR 113.

## II.   Evidence Relating to Punishment

### A.   The State's case

In addition to the heinous nature of the crime, the jury also heard testimony at the guilt/innocence phase detailing Halprin's participation in the escape from the Connally Unit. When fellow prisoner George Rivas invited Halprin to join in his escape plan, Halprin readily agreed. 47 RR 111–17. During the escape, the men ambushed a total of fourteen jailers, civilian employees, and trustees in the prison maintenance shop. 48 RR 4; 49 RR 57–78, 151, 170. Halprin and the other men physically overcame the hostages, bound their hands, and locked them in a storage room. Some of the hostages

were severely injured. 48 RR 4, 112–13, 119–21; 49 RR 88-93, 122–23, 130, 149–50, 167–69, 171, 177–78. After overcoming a guard in a watchtower, the men escaped from the prison in a maintenance department van, taking numerous weapons with them. 48 RR 6–8. While at large, the escapees robbed a Radio Shack store and a Western Auto Parts store before robbing the Oshman's Superstore and killing Officer Hawkins. 48 RR 7–10.

During the punishment phase, the jury heard additional evidence concerning Halprin's violent disposition and potential for future dangerousness. Prior to the escape, Halprin had been serving a thirty-year sentence for the felony offense of injury to a child. 48 RR 53–54, 82–83; 50 RR 126–29; SX 948–49. In August 1996, Halprin had been dating a woman named Charity Smith and was babysitting her toddler son, Jarrod. 47 RR 105. Halprin savagely beat the toddler, fracturing his skull, legs, and arms. 47 RR 100–02, 108; 48 RR 78–81; 49 RR 197–98, 205; SX 941–47. Both the skull fracture and the right femoral fracture could have been life threatening to the toddler. 51 RR 18.

Halprin was charged with one count of injury to a child, to which he confessed, pled guilty, and received a thirty-year sentence. 48 RR 53–54; SX 948–49. Halprin's confession to Fort Worth detective Renee Camper was read to the jury:

The first time I hit Jarrod he was sitting up on the bed and I hit him up side the left side of his head, just a slap. I hit him about five or six times. I didn't realize how hard I was hitting him. He laid back down and I pulled him back up and he was saying "mama." And I said, "Do you want to go to mama" and put him down. And then I kicked him on his real hurt knee and then he fell down. I got back up and I pushed him back down and he hit the floor real hard. I pulled him back up right hard by the wrist and I was telling him to stop crying. I didn't realize I was hurting him, but I think that I could have broken his arms then. I could have hurt his other leg when I was pushing him back down because he was trying to stay off his hurt leg and he was twisting, trying to get away, and I was shoving him back down. I guess I hurt his eye when I slapped him because I was slapping him hard enough to bruise his face. I wasn't aiming for any particular place. I was just slapping him. I got scared and I put him down on the bed and kept saying, "I'm sorry, I'm sorry."

50 RR 128–29.

## B.   Evidence presented by the Defense

In his defense, Halprin offered the testimony of several witnesses to garner the jury's sympathy and show that he would not be a future danger if sentenced to life imprisonment. The first witness was Thomas Warren from TDCJ's classification and records division, who testified that TDCJ had made changes to the way prisoners were classified after the escape of the Texas Seven. 51 RR 32. The defense then called former TDCJ Assistant Director S.O. Woods, who testified generally about the prison conditions Halprin would be in if sentenced to life imprisonment and described the prison while a videotape of the prison's layout played for the jury. 51 RR 72–94. Woods stated that

10

Halprin would be placed in administrative segregation if sentenced to life in prison, and that his life sentence would be stacked on top of the thirty-year sentence he was previously serving. 51 RR 65–67. Woods also stated that while Halprin did have four minor disciplinary violations prior to his escape, he did not have any major violations and was not affiliated with any gang. 51 RR 50– 53. Greg Porter, a sergeant with the Dallas County Sheriff's Department, then added that there had only been one minor incident since Halprin was in custody during trial, and that was for refusing to eat a tray of food. 51 RR 126– 27.

Mindi Sternblitz and Jason Goldberg were childhood friends of Halprin before he moved away to Kentucky in the seventh grade. 52 RR 5–13, 34–46. Both testified that Halprin had a good heart and did not get into any more trouble at school than any other young boy his age. 51 RR 5–8, 37–39. According to the friends, Halprin and his brother had a strained relationship with their adoptive father, Dan, and Halprin was always trying to please Dan any way he could. 51 RR 8–14, 37–42. Jason's mother, Terri Goldberg, agreed that Halprin had a strained relationship with his father, and testified that Halprin was a good and well-behaved person about whom she never had one single negative thing to say. 51 RR 54–68. On cross-examination, however, all

three admitted that Halprin's parents loved him, provided a loving home, and tried to be good parents. 51 RR 18–20, 48–49, 69–71.

Finally, the defense called Dr. Kelly Goodness, a clinical and forensic psychologist who interviewed Halprin and twelve of his acquaintances and gave Halprin a battery of psychological tests. 52 RR 4–72; 53 RR 16–62. Dr. Goodness testified that in her opinion, Halprin had a tumultuous childhood, a rigid adoptive father, untreated attention deficit disorder, avoidant personality disorder, and a predilection for drug abuse and depression. 52 RR 27–28, 30–34, 37, 39–41; 53 RR 28–41. She further stated that Halprin's disorders were not properly treated and that there was a complete absence of guidance from his parents that was necessary for a child with such special needs. 53 RR 37–39. Halprin's drug abuse was also a significant factor that helped him make bad decisions. 53 RR 39. But on cross-examination, Dr. Goodness conceded that Halprin was not insane and that he was capable of making a rational decision at the time of the murder. 53 RR 53–62.

## STANDARD OF REVIEW

Prior to filing a successive federal habeas petition in district court, a petitioner must obtain authorization from the Fifth Circuit to do so. 28 U.S.C. § 2244(b)(3)(A). To establish that he is entitled to such authorization, Halprin must make a prima facie showing that his claim falls within an exception

under 28 U.S.C. § 2244(b). *In re Campbell*, 750 F.3D 523, 530 (5th Cir. 2014).

That statute requires that

(1)     A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2)     A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless-

    (A)     the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (B)

        (i)     the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

        (ii)     the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). Under this standard, Halprin must make a sufficient

showing of possible merit to warrant a fuller exploration by the district court.

*Reyes-Requena v. United States*, 243 F.3d 893, 898–99 (5th Cir. 2001). The

Fifth Circuit may grant authorization to file a successive petition "[i]f in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition." *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003).

## ARGUMENT

### I. This Court Is Without Jurisdiction to Consider Halprin's Petition Because He Has Not Obtained Permission from the Fifth Circuit to File a Successive Petition.

Halprin's first federal habeas petition was denied with prejudice. DE 50. He has now filed a successive federal habeas petition raising a new claim alleging his right to due process was violated because his trial judge, Vickers Cunningham, harbored racist and religiously-bigoted views. DE 58. Halprin does not dispute that he has not requested or received authorization from the Fifth Circuit to file a successive habeas petition. Consequently, this Court is without jurisdiction to consider the merits of Halprin's petition. 28 U.S.C. § 2244(b)(3)(A).

Halprin argues that his petition is not successive because § 2244(b) does not—or should not—apply to his claim of judicial bias because the evidence supporting his claim could not have been discovered until May 2018 when media reports were published regarding Cunningham's bigoted views. DE 58 at 44–48. But the Fifth Circuit has stated plainly that "claims based on a

14

*factual* predicate not previously discoverable are successive." *Leal Garcia v. Quarterman*, 573 F.3d 214, 221 (5th Cir. 2009) (emphasis in original). Halprin's reading of § 2244(b) to render it inapplicable to claims that might not be discovered until after the initial federal habeas petition is denied "would permit an end-run around § 2244." *Id.* at 221. Indeed, the Fifth Circuit stated that AEDPA "forbids such a reading." *Id.* Consequently, this Court should dismiss Halprin's successive petition for want of jurisdiction. *See Burton v. Stewart*, 549 U.S. 147, 157 (2007) ("The long and short of it is that [the petitioner] neither sought nor received authorization from the Court of Appeals before filing his . . . petition, a 'second or successive' petition challenging his custody, and so the District Court was without jurisdiction to entertain it.").

Halprin also argues that his petition is not successive because it raises a claim that is similar in nature to a claim alleging incompetence to be executed—a claim that is not successive even if raised after the initial federal habeas petition is denied. *See Panetti v. Quartermani*, 551 U.S. 930, 945 (2007). He argues that his claim of judicial bias involves structural error, which, like competency to be executed, does not depend on the assessment of a petitioner's guilt. DE 58 at 44. Similarly, Halprin argues that the successiveness bar in § 2244(b) should not apply to claims of judicial bias for practical reasons and

because doing so would be contrary to congressional intent. DE 58 at 45–48. Halprin's argument is unsupportable.

First, as noted above, the fact that the factual basis of a claim is not discovered until after an initial federal habeas petition is denied is *not* a basis on which to conclude that § 2244(b) is inapplicable. *Leal Garcia*, 573 F.3d 221. Indeed, § 2244(b) explicitly contemplates petitioners discovering the predicate for a federal habeas claim after the conclusion of the initial proceedings. 28 U.S.C § 2244(b)(2)(B). In such a case, a petitioner must obtain authorization from the court of appeals to pursue such a claim in a successive petition and must meet the stringent requirements of the statute. 28 U.S.C. § 2244(b)(3)(A), (C); *see also In re Cathey*, 857 F.3d 221, 226 (5th Cir. 2017). That evidence of judicial bias might not be discovered until after the initial federal habeas petition is denied does not render AEDPA inapplicable. Halprin's effort to carve out an exception from § 2244(b) for claims that depend on facts that may be discovered after the initial habeas proceedings fails because the statute *explicitly* contemplates such an event and sets out the requirements for raising such a claim. DE 58 at 47.

Notably, § 2244(b)'s successiveness bar applies to claims the factual basis of which might not be initially discoverable. For example, claims alleging that the prosecution withheld exculpatory evidence are undoubtedly subject to

16

§ 2244(b). *Blackman v. Davis*, 909 F.3d 772, 778 (5th Cir. 2018); *see also In re Raby*, --- F.3d ---, 2019 WL 2353241, at *7–9 (5th Cir. 2019); *In re Davila*, 888 F.3d 179, 183–87 (5th Cir. 2018); *Johnson v. Dretke*, 442 F.3d 901, 911–12 (5th Cir. 2006). This is so even though evidence to support such a claim might not be discovered—due to suppression—until after a petitioner's initial federal habeas proceedings. In such a case, the statute requires a showing of diligence and that no reasonable factfinder would have found the petitioner guilty in light of the newly discovered evidence. 28 U.S.C. § 2244(b)(2)(B)(i), (ii). The nature of such a claim does not render § 2244(b) inapplicable.

Second, Halprin's claim of judicial bias is not similar to a claim that a petitioner is incompetent to be executed. In *Panetti*, the Supreme Court held that an allegation that the petitioner was incompetent to be executed was not successive. 551 U.S. at 947. The Court concluded that § 2244(b) does not render such a claim impermissibly successive because the claim does not become *ripe* until an execution date has been set. *Id*. at 945. The Court stated its holding plainly: "The statutory bar on 'second or successive' applications does not apply to [an incompetence-to-be-executed] claim brought in an application filed when the claim is first ripe." *Id*. at 947. Moreover, a claim alleging incompetence for execution challenges "some other species of legal error" that arises after the

17

underlying conviction—not the conviction itself. *See Leal Garcia*, 573 F.3d at 222.

Unlike an incompetence-to-be-executed claim, Halprin's judicial-bias claim explicitly argues his *conviction* occurred in violation of due process when Judge Cunningham failed to recuse himself because of a lifelong prejudice that existed at the time of trial. Such a claim did not become "ripe" only when he discovered evidence to support it. Rather, the legal claim that Halprin's trial judge was biased was always available; he simply discovered the factual predicate of the claim after his initial petition was denied. *See id.* Again, the statute explicitly contemplates petitioners discovering the predicate for a habeas claim after the initial habeas proceedings conclude. 28 U.S.C. § 2244(b)(2)(B).

Further, contrary to Halprin's assertion, the Court in *Panetti* did *not* conclude that § 2244(b) was inapplicable to claims of incompetence to be executed because such claims do not implicate a petitioner's guilt or innocence of the offense. DE 58 at 44, 46 (citing *Panetti*, 551 U.S. at 943–46). Rather, the Court held that such claims were not subject to the successiveness bar because

they may not be "ripe" when the initial federal habeas petition is filed. *Panetti*, 551 U.S. at 945–47.[4]

Halprin asks this Court to overlook *Panetti*'s rationale and to extend its exception to his claim because he cannot meet the statute's requirements. He suggests that his claim should be excepted from the statute because it is a "structural defect." DE 58 at 54. But *Penry*[5] and *Atkins*[6] claims are structural error claims, and both are subject to the statute's provisions. *See In re Webster*, 605 F.3d 256, 258 (5th Cir. 2010); *In re Kunkle*, 398 F.3d 683, 684–85 (5th Cir. 2005).

Halprin goes on to suggest that his claim should be excepted from the statute because it does not implicate his innocence of capital murder. But *Panetti* does not stand for the proposition that only innocence-implicating claims are subject to § 2244(b)'s stringent requirements. Nor does it stand for the inverse—that non-innocence claims are not subject to any limitation and can therefore be raised in petition after petition after petition. Not

---

[4]    A second federal habeas petition may also not be impermissibly successive where the initial petition was dismissed to allow for exhaustion of state-court remedies, *Slack v. McDaniel*, 529 U.S. 473, 478 (2000), or if the second petition attacks a separate judgment. *Magwood v. Patterson*, 561 U.S. 320, 332–34 (2010). This case implicates neither circumstance.

[5]    *Penry v. Lynaugh*, 492 U.S. 302 (1989).

[6]    *Atkins v. Virginia*, 536 U.S. 304 (2002).

19

surprisingly, other claims that do not contemplate a petitioner's innocence have been held subject to the statute. For example, § 2244(b)(2)(B) applies to claims alleging intellectual disability and ineffective assistance of trial counsel for failure to adequately investigate mitigating evidence *because* of—not in spite of—the fact that such claims do not implicate a petitioner's innocence of the offense. *See In re Garcia*, 756 F. App'x 391, 394 (5th Cir. 2018) ("As to [§ 2244(b)(2)(B)(ii)], Garcia's claim that federal habeas counsel was ineffective by not investigating further mitigating evidence that could have been brought at the punishment phase of trial does not, by its nature, affect whether a 'reasonable factfinder would have found [Garcia] *guilty of the underlying offense*.'") (emphasis in original) (citing *In re Rodriguez*, 885 F.3d 915, 918 (5th Cir. 2018)); *Turner v. Epps*, 460 F. App'x 322, 330 (5th Cir. 2012); *In re Webster*, 605 F.3d at 258 ("Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in that context."); *cf. Rocha v. Thaler*, 626 F.3d 815, 825–26 (5th Cir. 2010) ("The quality of mitigation evidence the petitioner would have introduced at sentencing has no bearing on his claim of actual innocence of the death penalty."). Such claims necessarily fail to satisfy § 2244(b)(2)(B). It does not follow that they are excepted from it.

But that is precisely what Halprin argues: that the statute does not apply because he cannot meet it. Under his logic, § 2244(b) would only bar a tiny fraction of claims in which petitioners allege their innocence, yet fail to establish it. For all the rest of the claims—which are many—petitioners would be entitled to endless rounds of litigation. Such an interpretation would gut the statute and the finality it was written to protect.

Moreover, application of § 2244(b) to Halprin's petition would not require, as he suggests, all petitioners to allege a claim of judicial bias in federal court to preserve such a potential claim. DE 58 at 47. Again, § 2244(b) lays out the requirements for raising a claim when its factual support is discovered after the initial habeas petition is denied. 28 U.S.C. § 2244(b)(2)(i), (ii). Simply put, Halprin does not justify *Panetti*'s extension—for the first time—to late discovered non-innocence claims.

The statute's provisions against successive petitions apply to Halprin's judicial bias claim. Because Halprin did not obtain authorization from the Fifth Circuit to file his successive petition, this Court does not have jurisdiction to consider it.

## II.     The Court Should Dismiss Halprin's Petition Because He Does Not Meet the Standards under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.

Even if this Court could consider Halprin's petition without authorization from the Fifth Circuit, the petition would be subject to dismissal because Halprin's claim does not meet the standards under § 2244 for filing a successive petition. Specifically, his claim that his trial judge harbored racist and religiously-bigoted views does not and cannot demonstrate that no reasonable factfinder would have found him guilty of capital murder but for the alleged constitutional error.[7] 28 U.S.C. § 2244(b)(2)(B). Consequently, Halprin's petition should be dismissed.

To obtain authorization to file a successive petition, Halprin must make a prima facie showing that he satisfies the prerequisites for a successive petition by showing that it is "reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition." *In re Campbell*, 750 F.3d at 530; *see In re Morris*, 328 F.3d at 740-41; 28 U.S.C. § 2244(b)(3)(C). This requires Halprin to show that no reasonable factfinder would have found him guilty but for Cunningham's alleged judicial bias. 28 U.S.C. § 2244(b)(2)(B)(ii).

---

[7]     Halprin does not argue that his judicial bias claim relies on a new, retroactive rule of constitutional law. 28 U.S.C. § 2244(b)(2)(A).

To be clear, the details of Cunningham's living trust and the accounts of those who knew Cunningham regarding his bigoted statements and beliefs are troubling to say the least. The Attorney General's Office does not condone or excuse Cunningham's creation of his living trust, and the racist and religiously-bigoted statements he is alleged to have made are abhorrent. To obtain merits review of his successive petition, however, § 2244(b)(2)(B) requires that Halprin show that his new evidence demonstrate that, but for the alleged constitutional error, no reasonable factfinder would have found him guilty of capital murder. Halprin's claim of judicial bias does not make such a showing or even allege that Halprin is innocent of the offense.[8] Consequently, he fails to satisfy the stringent requirements of § 2244 and his petition should be dismissed as impermissibly successive.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court dismiss Halprin's petition for lack of jurisdiction.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

---

[8] Halprin argues that he can show actual innocence of the death penalty. DE 58 at 44 n.17. That is wholly irrelevant to § 2244(b)(2)(B)(ii). Again, the successiveness bar requires a showing of actual innocence of the crime of conviction, not the sentence. *In re Webster*, 605 F.3d at 258.

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Jennifer Wren Morris
JENNIFER WREN MORRIS*
State Bar No. 24088680
Assistant Attorney General

*Lead Counsel for
Respondent

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280
email: *jennifer.morris@oag.texas.gov*

*Attorneys for Respondent*

24

## CERTIFICATE OF SERVICE

I do hereby certify that on June 12, 2019, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Filing" to the following attorney of record, who consented in writing to accept this Notice as service of this document by electronic means.

Paul Mansur                          Tivon Schardl
P.O. Box 1300                        Timothy Gumkowski
Denver City, Texas 79323             Capital Habeas Unit
                                     919 Congress, Suite 950
                                     Austin, Texas 78701

                                     s/ Jennifer Wren Morris
                                     JENNIFER WREN MORRIS
                                     Assistant Attorney General