UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RANDY ETHAN HALPRIN, | § | |
| | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 3:19-cv-01203-L |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | CASE INVOLVING THE DEATH PENALTY |
| | § | |
| Respondent. | § | |

## SUPPLEMENTAL APPENDIX IN
## SUPPORT OF MOTION AND REPLY

MAUREEN FRANCO
Federal Public Defender
Western District of Texas

TIVON SCHARDL
Chief, Capital Habeas Unit
Florida Bar No. 73016
TIMOTHY GUMKOWSKI
Assistant Federal Defender
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org
Tim_gumkowski@fd.org

PAUL E. MANSUR
Texas Bar No. 796078
P.O. Box 1300
Denver City, Texas 79323
(806) 592-2797 (tel.)
(806) 592-9136 (fax)
paul@paulmansurlaw.com

Counsel for Randy Ethan Halprin

| TITLE OF DOCUMENT | Page |
|---|---|
| Text Order Granting Motion to Stay, <br><br> *United States v. Fields*, No. 6:01-cr-00164-LY (W.D. Tex. May 19, 2016) | 31 |
| Order Granting Abeyance, <br><br> *United States v. Hall*, No. 4:16-cv-00391-Y (N.D. Tex. May 27, 2016) (Means, J.) | 32 |
| Subsequent Application for Post-Conviction Writ of Habeas Corpus, <br><br> *Ex parte Garcia*, No. 64,582-03, 2018 WL 6379949, (Tex. Crim. App. Nov. 30, 2018) | 33-57 |
| State's Motion to Set Execution Date <br><br> *State v. Halprin*, No. F01-327-T (283rd Jud. Dist. Ct., Dallas Cnty. June 5, 2019) | 58-62 |
| State's Amended Motion to Set Execution Date <br><br> *State v. Halprin*, No. F01-327-T (283rd Jud. Dist. Ct., Dallas Cnty. June 6, 2019) | 63-68 |

2255,CLOSED

# U.S. District Court [LIVE]
# Western District of Texas (Waco)
# CRIMINAL DOCKET FOR CASE #: 6:01-cr-00164-LY-1

Case title: USA v. Fields et al

Other court case numbers:  :04- -50393 5th Circuit-
Dft#1
W-09-CA-009 Waco Civil

Magistrate judge case number: 6:01-mj-00110

Date Filed: 12/11/2001

Date Terminated: 05/15/2017

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2016 | | Text Order GRANTING 378 Motion to Stay as to Sherman Lamont Fields (1) Entered by Judge Lee Yeakel. Movant's 2255 motion is held in abeyance pending the Fifth Circuit's authorization to file a successive motion. (This is a text-only entry generated by the court. There is no document associated with this entry.) (tmj) (Entered: 05/19/2016) |

Supp. App. 031

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:16-CV-391-Y |
| | § | (Criminal Case No. 4:94-CR-121-Y-2) |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

ORDER GRANTING ABEYANCE

Petitioner Orlando Cordia Hall (Hall) is a federal prisoner who has filed a successive motion to vacate his death sentence under 28 U.S.C. § 2255. He moves the Court to hold this case in abeyance while the Court of Appeals for the Fifth Circuit considers his application for authorization to file the successive motion. (Doc. 1196.) Hall certifies that the government does not oppose abeyance.

The Court GRANTS the motion to hold the case in abeyance. (Doc. 1196.) Hall's § 2255 motion is held in abeyance pending the Court of Appeals' ruling on his application for authorization to file a successive motion.

SIGNED May 27, 2016.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

FILED
11/14/2018 10:06 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS

<<am>> DEPUTY

**W01-00325-T (C)**

## IN THE 283RD JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS

### AND

## IN THE TEXAS COURT OF CRIMINAL APPEALS AUSTIN, TEXAS

| | | |
|---|---|---|
| **Ex parte Joseph C. Garcia,** | § | **Writ No. _____** |
| | § | |
| **Applicant.** | § | **Trial Court Case No. F01-00325-T** |
| | § | |
| | § | **CAPITAL CASE** |

## SUBSEQUENT APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

**JOSEPH C. GARCIA is scheduled to be executed on TUESDAY, DECEMBER 4, 2018.**

J. STEPHEN COOPER
Texas Bar No. 04780100
4711 Gaston Avenue
Dallas, Texas  75246-1013
(214)522-0670
(866)840-3860 facsimile
jstephencooper@yahoo.com

*Counsel for Joseph C. Garcia*

# TABLE OF CONTENTS

INDEX OF EXHIBITS ............................................................................... iv

TABLE OF AUTHORITIES ..................................................................... ix

INTRODUCTION ........................................................................................1

FACTUAL AND PROCEDURAL HISTORY .........................................2

   I.    Garcia's personal history .................................................................2

   II.   Bexar County altercation and wrongful conviction ......................9

   III.  Garcia's involvement in the "Texas Seven" ...............................17

   IV.  Dallas County capital trial proceedings ......................................20

   V.   Subsequent state-court and federal proceedings .........................26

   VI.  Warrant proceedings.....................................................................30

CLAIMS FOR RELIEF ...........................................................................32

   CLAIM ONE.........................................................................................32

The State procured a death sentence in violation of due process under *Ex parte Chabot* by unknowingly presenting false and misleading testimony.

   I.    The State's presentation of false and misleading evidence contravenes due process. ...........................................................................................34

   II.   The State conveyed to the jury that Garcia was properly convicted of murder in Bexar County after a fair trial at which he was competently represented by counsel. ...................................................................36

   III.  The State's presentation gave the jury a false impression of Garcia's Bexar County trial. ........................................................................433

   IV.  The State's misleading presentation regarding Garcia's Bexar County trial was material to the jury's sentencing decision. .........................60

   V.   Garcia's claim satisfies the requirements of Section 5 of Article 11.071, as the claim relies on a previously unavailable legal basis.............................66

   CLAIM TWO.........................................................................................68

Newly discovered evidence establishes that the judge who presided over Garcia's capital proceedings harbored racial animus toward nonwhites in violation of Garcia's rights to a fair trial in an impartial tribunal and to due process of law.

i

I.      News recently broke that Cunningham, who presided over Garcia's capital trial, holds bigoted beliefs regarding race. ............................................69

II.     Garcia's rights under state and federal law were violated as a result of being tried and sentenced to death in a tribunal wherein the presiding judge harbored racial animus toward nonwhites. ......................................................71

III.    Garcia's claim satisfies the requirements of Section 5 of Article 11.071, as the claim relies on a previously unavailable legal basis.............................799

CLAIM THREE ..................................................................................822

The evolving standards of decency under the Eighth Amendment now prohibit the execution of a person who neither killed nor intended to kill.

I.      Garcia was convicted under the law of parties and sentenced to death, despite the fact that the State did not even attempt to prove that he shot or intended to shoot Officer Hawkins. ................................................................82

II.     Given the evolving standards of decency, the Eighth Amendment now prohibits the execution of a person who neither killed nor intended to kill. ....89

III.    Garcia's claim satisfies the requirements of Section 5 of Article 11.071 in multiple ways. ..................................................................................95

CLAIM FOUR .....................................................................................96

Garcia was denied the effective assistance of counsel during the penalty phase of his capital trial proceedings.

I.      The Sixth Amendment demands that counsel conduct a reasonable investigation in order to safeguard a defendant's right to a reliable, individualized sentencing determination. ........................................................97

II.     Trial counsel's investigation was inadequate.........................................104

III.    Counsel's deficient performance at Garcia's penalty phase was prejudicial.......................................................................................120

IV.     This Court should overrule *Ex parte Graves* and hold that Garcia's claim satisfies the requirements of Section 5 of Article 11.071...............................133

CLAIM FIVE .....................................................................................150

Executing Garcia after 15 years on death row violates his right to be free from cruel and unusual punishment.

I.      The Eighth Amendment precludes the execution of an individual after an

Supp. App. 035

excessively long period on death row. ..........................................................150

II.    The Eighth Amendment specifically precludes the execution of an individual like Garcia, whose history and subjective fear render further punishment cruel and unusual. ......................................................156

III.    Garcia's claim satisfies the requirements of Section 5 of Article 11.071 in multiple ways. ..............................................................................160

CONCLUSION .................................................................................................163

VERIFICATION ...............................................................................................163

CERTIFICATE OF SERVICE ..........................................................................163

Supp. App. 036

# INDEX OF EXHIBITS

Exhibit 1    Bexar Cty. Appl. for Writ of Habeas Corpus Pursuant to Tex. Code Crim. Proc. Art. 11.07, *State v. Garcia*, No. 1996-CR-1258-W1, 10/02/18.

Exhibit 2    Bexar Cty. Court Docket, *State v. Garcia*, No. 1996-CR-1258, 03/03/97.

Exhibit 3    Bexar Cty. Indictment, *State v. Garcia*, No. 1996-CR-1258, 03/13/96.

Exhibit 4    Bexar Cty. Judgment of Conviction, *State v. Garcia*, No. 1996-CR-1258, 11/08/96.

Exhibit 5    Bexar Cty. RR Vol. II, *State v. Garcia*, No. 1996-CR-1258, 11/05/96.

Exhibit 6    Bexar Cty. RR Vol. III, *State v. Garcia*, No. 1996-CR-1258, 11/06/96.

Exhibit 7    Bexar Cty. RR Vol. IV, *State v. Garcia*, No. 1996-CR-1258, 11/07/96.

Exhibit 8    Bexar Cty. District Attorney's Notes.

Exhibit 9    Bobby Lee Lugo Statement to SAPD, Case 96-065410, 02/03/96.

Exhibit 10   Frank Trevino interview, SAPD Supp. Rpt., Case 96-065410, 02/04/96.

Exhibit 11   Brigitte Garza Statement to SAPD, Case 96-065410, 02/18/96.

Exhibit 12   Jocellyn Gutierrez Statement to SAPD, Case 96-065410, 02/04/96.

Exhibit 13   Luna SAPD Criminal History Rpts. re Piña.

Exhibit 14   Hidalgo Cty. Sheriff's Offense Rpt. re Alba, #94-31619, 11/21/94.

Exhibit 15   Hidalgo Cty. Register of Actions, *State v. Luna*, No. CR-125,727-B, 12/28/2017.

Exhibit 16   Hidalgo Cty. Complaint, *State v. Luna*, No. CR-125,727-B, 01/05/95.

Exhibit 17   Hidalgo Cty. Arraignment, *State v. Luna*, No. CR-125, 727-B, 02/06/95.

Supp. App. 037

Exhibit 18    Hidalgo Cty. Motion to Dismiss, *State v. Luna*, No. CR-125, 727-B, 06/27/95.

Exhibit 19    Hidalgo Cty. Original Petition for Divorce, *Luna v. Luna*, No. C-1618-91-A, 04/06/91.

Exhibit 20    RR Vol. 70, Def. Exhibit 11 & 12, Graham's Billing, *State v. Garcia*, No. F01-00325-T, 02/10/03.

Exhibit 21    RR Vol. 42 (excerpt), *State v. Halprin*, No. F01-00237-T, 06/02/03.

Exhibit 22    RR Vol. 43, *State v. Rivas*, No. F01-00323-T, 08/28/01.

Exhibit 23    RR Vol. 51 (excerpt), *State v. Newbury*, No. F01-00234-T, 01/14/01.

Exhibit 24    RR Vol. 43 (excerpt), *State v. Rodriguez*, No. F01-00326-T, 04/29/02.

Exhibit 25    1994 Texas State Bar Materials.

Exhibit 26    Psychological Rpt. re: Joseph C. Garcia by Victoria Reynolds, Ph.D., 09/11/18.

Exhibit 27    Standard of Care Rpt. by Mark Stevens, 09/30/18.

Exhibit 28    Decl. of Bruce E. Anton, *Garcia v. Stephens*, No. 06-CV-2185-M, 05/30/14.

Exhibit 29    San Antonio Independent School District Report Card.

Exhibit 30    Campaign Ad of Judge Vickers Cunningham.

Exhibit 31    Martin, White, straight and Christian: Dallas County candidate admits rewarding his kids if they marry within race, Dallas Morning News, 05/18/18.

Exhibit 32    Greenwood, Texas newspaper rescinds endorsement of GOP official over racial concerns, The Hill, 05/18/18.

Exhibit 33    Martin, Candidate prodded his kids to marry within race, Dallas Morning News, 05/19/18.

Exhibit 34    Pascoe, *Race, Gender, and Intercultural Relations: The Case of Interracial Marriage*, 12 Frontiers: A Journal of Women Studies (1991).

v

Exhibit 35   Edelstein, "Miscegenation," in The New Encyclopedia of Southern Culture Vol. 13 (Nancy Bercaw & Ted Ownby eds., 2009).

Exhibit 36   Lemire, "Epilogue: 'Miscegenation' Today," in Making Race in America (2002).

Exhibit 37   Brief of Amici Curiae, *Hithon v. Tyson Foods, Inc.*, 664 F.3d 883 (11th Cir. 2011) (No. 08-16135-BB).

Exhibit 38   Ifill, *When 'Boy' Is Not a Racist Remark*, The Root, 08/24/10.

Exhibit 39   Novkov, *Racial Constructions: The Legal Regulation of Miscegenation in Alabama, 1890-1934*, 20 L. & Hist. Rev. 225 (Summer 2002).

Exhibit 40   Findings of Facts, Conclusions of Law and Recommendation, *Ex parte Storey*, No. WR-75,828-02.

Exhibit 41   Brief for the Resp't, *Trevino v. Thaler*, 569 U.S. 413 (2013) (No. 11-10189).

Exhibit 42   Director's Supplemental Brief, *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. June 4, 2013) (No. 11-70031).

Exhibit 43   Decl. of Brigitte Garza, 01/24/18.

Exhibit 44   Decl. of Robert Barrientez, 02/01/18.

Exhibit 45   Decl. of Bobby Lugo, 04/10/18.

Exhibit 46   Decl. of Jimmy Allison, 04/10/18.

Exhibit 47   Decl. of Maria Salazar, 05/23/18.

Exhibit 48   Decl. of Jose Luis Martinez, 05/23/18.

Exhibit 49   Decl. of Frank Trevino, 06/06/18.

Exhibit 50   Decl. of Linda Alvarado, 06/07/18.

Exhibit 51   Decl. of Nancy Elizondo-Powell, 06/07/18.

Exhibit 52   Decl. of Ida Salinas, 06/07/18.

vi

Exhibit 53    Decl. of Carmen Leon, 06/13/18.

Exhibit 54    Decl. of Mark Vella, 06/15/18.

Exhibit 55    Decl. of Jason Carmona, 06/20/18.

Exhibit 56    Decl. of David Alba, 07/02/18.

Exhibit 57    Decl. of Michael Yancey, 07/03/18.

Exhibit 58    Decl. of Margarita Laboy, 07/21/18.

Exhibit 59    Decl. of Debra Garza, 08/01/18.

Exhibit 60    Decl. of Hugh Lucas, 10/14/18.

Exhibit 61    Decl. of Paul Brauchle, 10/30/18.

Exhibit 62    Decl. of Brad Lollar, 11/01/18.

Exhibit 63    Aff. of Richard Langlois, 07/28/14.

Exhibit 64    Claim for Services of Brad Lollar, 08/02.

Exhibit 65    Claim for Services of Matt Fry, 03/11/05.

Exhibit 66    Claim for Services of Richard Langlois.

Exhibit 67    Timesheet of Richard Langlois.

Exhibit 68    Timesheet of Hugh Lucas.

Exhibit 69    Psychosocial History by Toni Knox, *Garcia v. Quarterman*, 3:06-CV-02185-BF, 04/02/08.

Exhibit 70    Timeline by Toni Knox, *Garcia v. Quarterman*, 3:06-CV-02185-BF, 04/02/08.

Exhibit 71    TDJC Health Records.

Exhibit 72    Autopsy Rpt. (excerpt).

Supp. App. 040

Exhibit 73    Bexar Cty. Order Designating Issues, *Ex parte Garcia*, No. 1996-CR-1258-W1, 10/31/18.

Exhibit 74    Bexar Cty. Order On Appl. for Post Conviction Writ re: Vincent Callahan, *Ex parte Garcia*, No. 1996-CR-1258-W1, 10/31/18.

Exhibit 75    Bexar Cty. Motion to Designate Issues of Fact to be Resolved and Request for Evidentiary Hearing, *State v. Garcia*, No. 1996-CR-1258-W1, 11/06/18.

Exhibit 76    Bexar Cty. Proposed Order Designating Issues, *State v. Garcia*, No. 1996-CR-1258-W1, 11/06/18.

Exhibit 77    Bexar Cty. Response to Applicant's Petition for Writ of Habeas Corpus, *Ex Parte Garcia*, No. 1996-CR-1258-W1, 10/31/18.

Exhibit 78    Docket of Initial 11.071 Proceedings, *Ex parte Garcia*, No. W01-00325-T(A).

Exhibit 79    Coast Guard Record (excerpts).

Exhibit 80    Correspondence between Richard Langlois and Joseph C. Garcia.

applicant filed his previous application." *Id.* at 205.

Similarly, Garcia's most recent application for state habeas relief was filed on November 12, 2007. (*See* Subsequent Appl. for a Writ of Habeas Corpus Pursuant to Article 11.071 § 5, *Ex parte Garcia*, No. WR-64,582-02 (Tex. Crim. App. Nov. 12, 2007).) This Court did not issue its decision in *Chabot* until 2009. As Garcia's claim of unknowing false testimony was legally unavailable on the date he filed his previous application for state habeas relief, this claim is cognizable in a successor application. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(1).

While Garcia contends that he is entitled to relief on the record before this Court, if this Court determines that further factual development is necessary, Garcia is entitled to discovery and to an evidentiary hearing, for he has set forth herein colorable allegations that his death sentence was obtained in violation of his constitutional rights.

## CLAIM TWO

**Newly discovered evidence establishes that the judge who presided over Garcia's capital proceedings harbored racial animus toward nonwhites in violation of Garcia's rights to a fair trial in an impartial tribunal and to due process of law.**

Garcia, a Hispanic man, went to trial before former Dallas County District Court Judge Vickers Cunningham. Recently, it came to light that Cunningham espouses bigoted beliefs toward nonwhite people. Because Garcia was tried before a judge who harbored racial animus toward nonwhites, Garcia was denied the fair

68

trial before an impartial tribunal and the due process of law guaranteed to him by the Sixth and Fourteenth Amendments to the U.S. Constitution.

**I.     News recently broke that Cunningham, who presided over Garcia's capital trial, holds bigoted beliefs regarding race.**

Garcia is a Hispanic man. (72 RR pdf 122; Ex. 29 at 1.) Between May 2002 and February 2003, now-former Dallas County District Court Judge Vickers Cunningham presided over Garcia's capital trial and sentencing proceedings. (*See, e.g.*, 5 RR 1–46 (Cunningham presiding over pretrial matters); 50 RR 1–60 (Cunningham presiding on date that jurors convicted Garcia); 56 RR 1–156 (Cunningham presiding on date that jurors sentenced Garcia to death).) Prior to ascending to the criminal bench, Cunningham had served as a prosecutor in the Dallas County District Attorney's Office from 1988 to 1994 (*see* Ex. 30), which institutionalized racial discrimination, *see, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 263–64 (2005) (discussing the removal of nonwhite prospective jurors as the official policy of the Dallas County District Attorney's Office). More than fifteen years after Cunningham presided over the trial at which Garcia was convicted and sentenced to death, Cunningham revealed his racially prejudiced attitudes in an interview with the Dallas Morning News. Naomi Martin, *White, straight and Christian: Dallas County candidate admits rewarding his kids if they marry within race*, Dallas Morning News (May 18, 2018), https://www.dallasnews.com/news/dallas-county/2018/05/18/marry-white-straight-christian-dallas-county-politician-admits-

69

rewarding-kids-within-traditional-family-values. In that interview, Cunningham not only acknowledged that he had created a living trust for his children that financially penalized them if they opted to marry a nonwhite person, but he also justified his actions as the product of his "strong[ ] support" for "traditional family values." *Id.*

Beyond exposing Cunningham's creation of a racist trust fund for his children, the Dallas Morning News also reported that people close to Cunningham—including his mother, brother, and a former political aide—knew him to be "a longtime bigot." *Id.* According to Amanda Tackett, who worked on Cunningham's 2006 campaign for district attorney, "the former judge repeatedly use[d] the N-word to insult black people behind their backs." *Id.* She also stated that Cunningham "described criminal cases involving black people as 'T.N.D.s,' short for 'Typical [N-word] Deals.'" *Id.* When asked about his use of the N-word, Cunningham denied using the epithet in everyday life, *id.*, but left open the possibility that he employed it in court "in [the] context of trial." Max Greenwood, *Texas newspaper rescinds endorsement of GOP official over racial concerns*, The Hill (May 18, 2018), https://thehill.com/homenews         /news/388427-texas-newspaper-withdraws-endorsement-of-gop-official-over-racial-concerns. Cunningham's mother and brother also attested to his frequent use of racial epithets. Naomi Martin, *Candidate prodded his kids to marry within race*, Dallas Morning News (May 19, 2018). Cunningham's brother, Bill, reported that Cunningham routinely referred to Bill's

70

husband, a black man, as "your boy," and refused Bill's husband entry into his home. Martin, *White, straight and Christian*. Meanwhile, a text message authored by Cunningham's son further revealed that Cunningham's racial bigotry extended not only to African Americans, but to nonwhite people in general:

> I am making my father except [sic] interracial relationships starting with me and my relationship with my Vietnamese girlfriend. It's a slow process but [ ] i have faith in him turning around. And if he doesn't he will have one less person at his dinner table.

*Id.* Confronted with the evidence and allegations pointing to his racist attitudes, Cunningham denied their veracity. *Id.* And although "[a]s a judge in [Dallas] county for 10 years, he sent scores of black and Hispanic people to prison," Cunningham claimed that "his views on his children marrying outside their race never translated into unfairness on the bench or discrimination in any way." *Id.*

## II. Garcia's rights under state and federal law were violated as a result of being tried and sentenced to death in a tribunal wherein the presiding judge harbored racial animus toward nonwhites.

The constitutional floor established by the Fourteenth Amendment's Due Process Clause requires "a 'fair trial in a fair tribunal,' before a judge with no actual bias against [a] defendant." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)) (citation omitted); *In re Murchison*, 349 U.S. 133 (1955); *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside,

no matter how strong the evidence against him." (quoting *Edwards v. Balisok*, 520

U.S. 641, 647 (1997))). "Fairness of course requires an absence of actual bias in the

trial of cases," the Supreme Court has explained, "[b]ut our system of law has always

endeavored to prevent even the *probability* of unfairness." *In re Murchison*, 349 U.S.

at 136 (emphasis added). This elemental tenet aims to protect the legitimacy of the

judicial system by ensuring that "a criminal trial can[ ] reliably serve its function as

a vehicle for determination of guilt or innocence . . . before an impartial judge and

jury." *Rose v. Clark*, 478 U.S. 570, 577–78 (1986) (internal citation omitted).

   While there normally exists a presumption that trial judges are impartial and

"properly discharge[] their official duties," *Bracy*, 520 U.S. at 909, that presumption

is rebutted and recusal required where "the *probability* of actual bias on the part of

the judge or decisionmaker is too high to be constitutionally tolerable," *Withrow*,

421 U.S. at 47 (emphasis added); *see also* Tex. R. Civ. P. 18b(a)(b) (providing that

"[a] judge *must* recuse in any proceeding in which: [ ] the judge's impartiality *might*

*reasonably* be questioned" (emphasis added)). The Supreme Court has said time and

again that a petitioner need not prove actual bias in order to establish a due process

violation. *In re Murchison*, 349 U.S. at 136 (explaining that due process mandates a

"stringent rule" that may sometimes require the recusal of judges "who have no

actual bias and who would do their very best to weigh the scales of justice equally"

if there exists even a "probability of unfairness"); *Caperton v. A.T. Massey Coal Co.*,

556 U.S. 868, 883 (2009) ("[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias."); *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (per curiam) ("Under our precedents, the Due Process Clause may sometimes demand recusal even when a judge has no actual bias." (alterations and internal quotations omitted)). "[J]ustice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. at 136, and the Constitution is offended where there exists even "a *risk* of actual bias," *Withrow*, 421 U.S. at 47 (emphasis added); *cf. Caperton*, 556 U.S. at 883 (observing that "actual bias" is often difficult to ascertain, but that "if disclosed, [it] no doubt would be grounds for appropriate relief").

Whether the risk or probability of unfairness on the part of a judge exists has no mechanical answer and "cannot be defined with precision." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (internal quotation marks omitted). Rather, the constitutional analysis requires that "[c]ircumstances and relationships must be considered." *In re Murchison*, 349 U.S. at 136; *see Kemp v. State*, 846 S.W.2d 289, 305 (Tex. Crim. App. 1992) (explaining that due process requires recusal where "a reasonable man, knowing all the circumstances involved, would harbor doubts as to the impartiality of the trial judge"). A reviewing court presented with a claim of judicial bias must ask "whether, considering all the circumstances alleged, the risk of bias [is] too high to be constitutionally tolerable." *Rippo*, 137 S. Ct. at 907. And while bias on the part of a judge is generally cause for constitutional concern, the

United States' sordid history of state-sanctioned racial oppression renders racial bias "especially pernicious in the administration of criminal justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979); *see also Buck v. Davis*, 137 S. Ct. 759, 777 (2017) (cautioning that when it comes to racism in the criminal-justice system, "[s]ome toxins can be deadly in small doses").

These principles, brought to bear here, make it clear that Garcia was denied the impartial tribunal to which due process entitled him. *See* U.S. Const. amend. XIV; Tex. Const. art. 1, §§ 1, 19. Indeed, Cunningham's acknowledged use of racial epithets and his antimiscegenationist[25] beliefs—his beliefs against the mixing of races—demonstrate more than simply "a risk of actual bias" against nonwhite people like Garcia. *Withrow*, 421 U.S. at 47. Instead, they evidence Cunningham's bona fide belief in the inferiority of nonwhite people, as well as his subscription to white supremacist ideology.

Numerous courts across the country, including the Fifth Circuit Court of Appeals, have recognized in various contexts that an individual's use of racial slurs

---

[25] "Miscegenation," as used throughout this application, refers—in keeping with its historical, but not uncontested, definition—both to marriage between a white person and an individual from a nonwhite racial group, and to interracial sex. (Ex. 34 at 5–6 (writing that the term "miscegenation" first emerged in the 1860s among state legislators in the United States to refer to "mixture of the races"); Ex. 35 at 184 (explaining that the term "miscegenation" first emerged between 1863–1864, described "the sexual mixing of races," and posed "a threat to continuing white supremacy and supposed racial purity"); Ex. 36 at 145 (referencing, and contesting—because it reinforced the notion that "race" is biological rather than socially constructed—scholar Richard Newman's definition of "miscegenation" as both "sexual relations across racial lines," and as "interracial marriage").)

"constitutes *direct evidence* of discriminatory intent." *Kinnon v. Arcoub, Gopman & Assoc., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (emphasis added); *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997) (explaining that racial slurs used "even in jest could be evidence of racial antipathy") (quoting *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 114 (7th Cir. 1990)); *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (finding that a supervisor's "use of racial slurs constitutes direct evidence that racial animus was a motivating factor" in a disciplinary decision and not merely "an innocent habit"). Cunningham's oft-used epithet—the N-word—is "a universally recognized opprobrium, stigmatizing African-Americans because of their race." *Brown*, 989 F.2d at 861. Meanwhile, the pejorative term "boy," which Cunningham used to describe his African-American brother-in-law, is one that has historically dehumanized, humiliated, and subordinated black men. *See* Br. of Amici Curiae in Support of Pl.-Appellant at 8, *Hithon v. Tyson Foods, Inc.*, 664 F.3d 883 (11th Cir. 2011) (No. 08-16135-BB) ("During slavery and segregation, whites customarily referred to African-American adult males as 'boy' to reinforce their racially subordinate status."), https://www.naacpldf.org/wp-content/uploads/Hithon-Brief.pdf; Sherrilyn A. Ifill, *When 'Boy' Is Not a Racist Remark*, The Root (Aug. 24, 2010), https://www.theroot.com/when-boy-is-not-a-racist-remark-1790880694 (explaining the "racial significance" of whites' use of the term "boy" as intended "to

75

demasculinize black men[]"). Cunningham's use of anti-black slurs reflects a mindset and a worldview framed by racism, and gives rise to troubling questions about Cunningham's attitudes toward people of color more generally, including toward Hispanics like Garcia. At minimum, however, a sitting trial judge's subscription to racist ideas about a particular racial/ethnic group illustrates the lack of impartiality that due process requires.

If Cunningham's use of racial slurs in and out of the courtroom is insufficient to establish that Garcia's right to stand trial before an impartial judge was transgressed, then Cunningham's antimiscegenationist beliefs dispel any doubt. *See* Martin, *White, straight and Christian* (Cunningham justifying his creation of a trust fund that financially penalized his children for marrying nonwhites as the product of his "strong[ ] support" for "traditional family values"). One need only consult the historical record to learn that in the United States "[t]he struggle against miscegenation was at bottom a struggle to establish and maintain whiteness as a separate and impermeable racial category." Julie Novkov, *Racial Constructions: The Legal Regulation of Miscegenation in Alabama, 1890-1934*, 20 L. & Hist. Rev. 225, 226 (Summer 2002). The "major worry" of those whites in late nineteenth- and early twentieth-century America who opposed racial amalgamation was "that miscegenation would ultimately result in the degradation of white blood." *Id.* at 234. In other words, whites' opposition to racial mixing was grounded in their

76

fundamental belief that nonwhites carried, and could transmit to any mixed-race offspring, an inferiority that existed not only at a societal level but also at the level of genetics. Racial mixing was thus off-limits as it "undermined white supremacy, and thus whiteness itself," by bringing whites and nonwhites together "into the most fundamental unit of society, the family." *Id.* at 226.

Viewed through the lens of history, Cunningham's opposition to interracial marriage, and his invocation of "traditional family values" to justify this belief, reflect his endorsement of white supremacy and his attendant belief in the social and biological inferiority of nonwhite persons; those beliefs made "fair judgment" in Garcia's case "impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *Buntion*, 524 F.3d at 673 ("[J]udicial opinions will support an actual bias claim if they reveal favoritism or antagonism such that fair judgment is impossible." (quoting *Liteky*, 510 U.S. at 555)).

The race-based antipathy toward nonwhite people that Cunningham's racial attitudes reflect deprived Garcia—a Hispanic man condemned to suffer the state's most severe sanction for allegedly killing a white man (*see* Ex. 73)—of that impartial tribunal which the Fourteenth Amendment, and Texas law, guarantees to him. *See Buntion*, 524 F.3d at 672 ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." (quoting *Edwards*, 520 U.S. at 647)). And if, for argument's sake, Cunningham's

bigotry was insufficient to demonstrate actual bias, then at minimum it gives rise to an unconstitutional risk of bias that is structural error and entitles Garcia to relief. *See Withrow*, 421 U.S. at 47 (explaining that the presumption that trial judges are impartial is rebutted and recusal required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable"); *Tumey v. Ohio*, 273 U.S. 510 (1927) (adjudication by biased judge is structural constitutional error); *Johnson v. United States*, 520 U.S. 461, 468 (1997) (referring to lack of an impartial judge as "a structural error"—that is, "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself"); *Norris v. United States*, 820 F.3d 1261, 1266 (11th Cir. 2016) (explaining that a biased judge constitutes structural error because courts "cannot review a trial transcript to determine whether the presiding judge, despite his actual bias, was fair: 'The record does not reflect the tone of voice of the judge, his facial expressions, or his unspoken attitudes and mannerisms, all of which, as well as his statements and rulings of record, might have adversely influenced the jury and affected its verdict.'" (quoting *United States v. Brown*, 539 F.2d 467, 469 (5th Cir. 1976) ("Within the purview of a fair trial, the judge himself is on trial, and must be always aware of that fact."))). Because of Cunningham's actual bias—or, at the very least, because of the constitutionally intolerable risk of bias—Garcia is entitled to relief.

78

### III.  Garcia's claim satisfies the requirements of Section 5 of Article 11.071, as the claim relies on a previously unavailable legal basis.

As noted in Claim One, *supra*, this Court may consider the merits of, or grant relief on, a claim in a subsequent post-conviction application unless, for example,

> the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(1). A claim is "factually unavailable" if "the factual basis was not ascertainable through the exercise of reasonable diligence on or before [the date of the previous application]." *Id.*, § 5(e). The claim that Garcia asserts here satisfies these requirements.

First, Garcia's claim—that a judge who harbored racial animus toward nonwhites, like himself, presided over his capital trial and sentencing proceedings—was not previously raised either on direct appeal or in Garcia's prior post-conviction proceedings. (*See generally* Original Br. of Appellant, *Garcia v. State*, No. AP-74,692 (Tex. Crim. App. Jan. 26, 2004); Appl. for Post-Conviction Writ of Habeas Corpus, *Ex parte Garcia*, No. W01-00325-T(A) (Tex. Crim. App. Dec. 14, 2004); Subsequent Appl. for Writ of Habeas Corpus Pursuant to Article 11.071 § 5, *Ex parte Garcia*, No. W01-00325-T(B) (Tex. Crim. App. Nov. 12, 2007).) Nor could it have been. As explained *supra*, the factual basis for this claim became available only

79

on May 18, 2018, with the publication by the Dallas Morning News of evidence supplied by Cunningham's relatives that Cunningham espoused racially bigoted beliefs. Second, Garcia reasonably relied upon the presumption that Cunningham, as a trial judge, was impartial and "properly discharged [his] official duties," *Bracy*, 520 U.S. at 909. Prior to May 18, 2018, Garcia had no basis upon which to believe that Cunningham harbored racially bigoted beliefs. Due diligence cannot require Garcia to have previously discovered and litigated a fact which he had no reason to believe existed until now. This conclusion is supported by the very definition of "due diligence," which is "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Black's Law Dictionary* (10th ed. 2014). Finally, the facts underlying this claim were beyond Garcia's ability to discover previously because their revelation was "primarily outside of [his] counsel's control." *Ex parte Gobert*, No. WR-77,090-01, 2012 WL 479689, at *1 (Tex. Crim. App. Feb. 15, 2012) (per curiam) (not designated for publication) (deeming an untimely habeas application properly filed because application relied on "circumstances primarily outside of counsel's control"). As set forth *supra*, the information about Cunningham's racially bigoted beliefs was harbored, and disclosed for the first time, by Cunningham's relatives and close associates—individuals with whom defendants are not normally expected to speak. *Cf.* Findings of Fact, Conclusions of Law & Recommendation, at

80

4, *Ex parte Storey*, No. WR-75,828-02 (Crim. Dist. Ct. No. 3, Tarrant Cty., Tex. May 8, 2018) (finding successive habeas applicant diligent under Texas Code of Criminal Procedure Article 11.071 where application relied on information from members of the murder victim's family—individuals who "in most cases . . . do not wish to speak to lawyers representing the person found guilty of killing their loved one").

While Garcia cannot reasonably be expected to have discovered the factual basis supporting this claim previously in order to comply with statutory obligations, *see* Tex. Code Crim. Proc. Ann. art. 11.071, § 3(a) (requiring state habeas counsel to "investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus"), he has demonstrated diligence here: the facts underlying this claim first became available to Garcia on May 18, 2018, and, within six months of that date, Garcia has initiated the instant application raising his newly available challenge to his conviction and sentence of death. The requirements of Section 5(a)(1) are thus satisfied.

While Garcia contends that he is entitled to relief on the record before this Court, if this Court determines that further factual development is necessary, Garcia is entitled to discovery and to an evidentiary hearing, for he has set forth herein colorable allegations that his conviction and death sentence were obtained in

81

violation of his constitutional rights.

## CLAIM THREE

**The evolving standards of decency under the Eighth Amendment now prohibit the execution of a person who neither killed nor intended to kill.**

Garcia faces execution despite the fact that he was convicted under the law of parties without proof that he killed or intended to kill Officer Hawkins. There now exists a consensus against the execution of an individual who neither killed nor intended to kill. Moreover, such an execution furthers no permissible societal objective. Accordingly, this Court should hold that the evolving standards of decency embraced by the Eighth and Fourteenth Amendments to the U.S. Constitution no longer tolerate the execution of an individual convicted of capital murder without evidence that he killed or intended to kill the victim. *See* U.S. Const. amends. VIII, XIV.

**I.**   **Garcia was convicted under the law of parties and sentenced to death, despite the fact that the State did not even attempt to prove that he shot or intended to shoot Officer Hawkins.**

At Garcia's capital trial, the State wasted little time before drilling into jurors the import of Texas' law of parties to the case. As the jury was later instructed, the law of parties provides, in part, as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the

82

by the convicting court; and that the Court grant any other relief that law or justice

requires.


Dated: November 14, 2018                             Respectfully submitted,


                           /s/J. Stephen Cooper

                           J. STEPHEN COOPER

                           Texas Bar No. 04780100

                           4711 Gaston Avenue

                           Dallas, Texas  75246-1013

                           (214)522-0670

                           (866)840-3860 facsimile

                           jstephencooper@yahoo.com


                           *Counsel for Joseph C. Garcia*

164

F01-00327-T

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 283rd JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## STATE'S MOTION TO SET EXECUTION DATE

THE STATE OF TEXAS, by and through the Criminal District Attorney of Dallas County, respectfully requests that this Court enter an order setting Thursday, October 10, 2019 as the execution date for Randy Ethan Halprin. In support, the State presents the following:

### Factual History

Halprin is one of the Texas Seven. On December 13, 2000, he escaped from the Texas Department of Criminal Justice Connally Unit along with six other inmates: George Rivas, Larry Harper, Michael Rodriguez, Donald Newbury, Joseph Garcia, and Patrick Murphy. Together they stole firearms and ammunition from the prison and made their way to Irving, Texas, where they planned to commit the robbery of a sporting-goods store on Christmas Eve.

The robbery was planned meticulously. The day before the robbery, Halprin went inside the store to case it. On the day of the robbery, Halprin and three other escapees walked inside pretending to be customers; two escapees entered disguised

Supp. App. 058

as security guards; and one escapee remained outside hidden in a vehicle to monitor police radio frequencies, to act as a lookout, and to keep the others updated via two-way radios. All were armed with stolen firearms.

The escapees inside the store ushered the employees at gunpoint to the break room where the men forced them to kneel, facing the wall. After binding the employees, the escapees stole the employees' personal belongings, more than $70,000 in cash, 44 firearms, ammunition, and other equipment.

A bystander in the parking lot noticed the commotion inside the store and contacted the police. Officer Hawkins was the first to arrive on the scene. The lookout soon radioed Halprin and the other escapees inside to warn them that a police squad car was driving through the parking lot. As the escapees were exiting through the back of the store, Officer Hawkins pulled in behind the escapees' getaway vehicle. And before Officer Hawkins could stop his car or unholster his firearm, the escapees opened fire on him. Officer Hawkins suffered 11 gunshot wounds fired by at least five different guns. The escapees then pulled Officer Hawkins from his patrol vehicle, left him on the pavement, and stole his firearm. Fleeing the scene, the escapees backed their getaway vehicle over Officer Hawkins and dragged him several feet. They again escaped before other officers arrived.

The escapees then rendezvoused and fled to Colorado. This offense and others led law enforcement to launch a nationwide manhunt for Halprin and his fellow

escapees. Posing as traveling missionaries, they traveled together to a motel and RV park in Woodland Park, Colorado, where they eventually drew suspicion. Law enforcement apprehended Halprin at the RV park, and arrested Rivas, Garcia, Rodriguez, Newbury, and Murphy at nearby locations. Harper committed suicide to avoid capture.

Shortly after, Halprin confessed to the robbery.

## Procedural History

Halprin was indicted for the capital murder of Officer Hawkins, and a jury found him guilty as charged in the indictment. On June 12, 2003, in accordance with the jury's answers to the special issues, this Court sentenced Halprin to death.

Halprin appealed, and on June 29, 2005, the Court of Criminal Appeals affirmed this Court's judgment and sentence of death. *Halprin v. State*, 170 S.W.3d 111, 113 (Tex. Crim. App. 2005).

While Halprin's direct appeal was pending, he filed an application for writ of habeas corpus in this Court. This Court entered findings of fact and conclusions of law and recommended that habeas relief be denied. The Court of Criminal Appeals adopted this Court's findings and conclusions (with some limited exceptions) and denied habeas relief on March 20, 2013. *Ex parte Halprin*, WR-77,175-01, 2013 WL 1150018, at *1 (Tex. Crim. App. Mar. 20, 2013) (not designated for publication).

Halprin then filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Texas, which denied relief on September 27, 2017. *Halprin v. Davis*, Civ. A. No. 3:13-CV-1535-L, 2017 WL 4286042, at *1 (N.D. Tex. Sept. 27, 2017). The Fifth Circuit Court of Appeals affirmed and denied a certificate of appealability on December 17, 2018. *Halprin v. Davis*, 911 F.3d 247, 252 (5th Cir. 2018). To date, Halprin has not filed a petition for writ of certiorari from that decision.

In the interim, however, Halprin filed a second petition for writ of habeas corpus in the U.S. District Court for the Northern District of Texas, and later still, Halprin filed a motion to stay and abate the proceedings related to his second federal petition.

## Request

The State respectfully requests that this Court issue an order setting Halprin for execution on Thursday, October 10, 2019. *See generally* Tex. Code Crim. Proc. art. 43.141. Under Texas law, Murphy's execution may not be set earlier than 91 days after the date this Court enters the order setting the execution date. *See id.* art. 43.141(c). As of the date the State makes this request, the proposed execution date is 127 days away. This proposed execution date, then, accommodates the 91-day rule and allows Murphy a reasonable amount of time to investigate or litigate potential claims.

The State has informed Murphy's counsel, Timothy Gumkowski, of this potential execution date, and Mr. Gumkowski has expressed no scheduling conflicts specific to the date.

## Conclusion

The State respectfully requests that this Court issue an order setting Halprin for execution on Thursday, October 10, 2019.

Respectfully submitted,

*Brian P. Higginbotham*

JOHN CREUZOT
Criminal District Attorney
Dallas County, Texas

BRIAN P. HIGGINBOTHAM
Assistant Criminal District Attorney
State Bar No. 24078665
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3625 | (214) 653-3643 fax
brian.higginbotham@dallascounty.org

## Certificate of Service

I certify that a true copy of this document was served on Timothy Gumkowski as counsel for Randy Ethan Halprin. Service was made via electronic service to tim_gumkowski@fd.org on June 5, 2019.

*Brian P. Higginbotham*

Brian P. Higginbotham

FILED
6/6/2019 3:55 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
LJ DEPUTY

F01-00327-T

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 283rd JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## STATE'S AMENDED MOTION TO SET EXECUTION DATE

THE STATE OF TEXAS, by and through the Criminal District Attorney of Dallas County, respectfully requests that this Court enter an order setting Thursday, October 10, 2019 as the execution date for Randy Ethan Halprin. The State submits this motion to amend and replace the "State's Motion to Set Execution Date," which was filed on June 5, 2019.

In support, the State presents the following:

### Factual History

Halprin is one of the Texas Seven. On December 13, 2000, he escaped from the Texas Department of Criminal Justice Connally Unit along with six other inmates: George Rivas, Larry Harper, Michael Rodriguez, Donald Newbury, Joseph Garcia, and Patrick Murphy. Together they stole firearms and ammunition from the prison and made their way to Irving, Texas, where they planned to commit the robbery of a sporting-goods store on Christmas Eve.

The robbery was planned meticulously. The day before the robbery, Halprin went inside the store to case it. On the day of the robbery, Halprin and three other escapees walked inside pretending to be customers; two escapees entered disguised as security guards; and one escapee remained outside hidden in a vehicle to monitor police radio frequencies, to act as a lookout, and to keep the others updated via two-way radios. All were armed with stolen firearms.

The escapees inside the store ushered the employees at gunpoint to the break room where the men forced them to kneel, facing the wall. After binding the employees, the escapees stole the employees' personal belongings, more than $70,000 in cash, 44 firearms, ammunition, and other equipment.

A bystander in the parking lot noticed the commotion inside the store and contacted the police. Officer Hawkins was the first to arrive on the scene. The lookout soon radioed Halprin and the other escapees inside to warn them that a police squad car was driving through the parking lot. As the escapees were exiting through the back of the store, Officer Hawkins pulled in behind the escapees' getaway vehicle. And before Officer Hawkins could stop his car or unholster his firearm, the escapees opened fire on him. Officer Hawkins suffered 11 gunshot wounds fired by at least five different guns. The escapees then pulled Officer Hawkins from his patrol vehicle, left him on the pavement, and stole his firearm. Fleeing the scene, the

escapees backed their getaway vehicle over Officer Hawkins and dragged him several feet. They again escaped before other officers arrived.

The escapees then rendezvoused and fled to Colorado. This offense and others led law enforcement to launch a nationwide manhunt for Halprin and his fellow escapees. Posing as traveling missionaries, they traveled together to a motel and RV park in Woodland Park, Colorado, where they eventually drew suspicion. Law enforcement apprehended Halprin at the RV park, and arrested Rivas, Garcia, Rodriguez, Newbury, and Murphy at nearby locations. Harper committed suicide to avoid capture.

Shortly after, Halprin confessed to the robbery.

## Procedural History

Halprin was indicted for the capital murder of Officer Hawkins, and a jury found him guilty as charged in the indictment. On June 12, 2003, in accordance with the jury's answers to the special issues, this Court sentenced Halprin to death.

Halprin appealed, and on June 29, 2005, the Court of Criminal Appeals affirmed this Court's judgment and sentence of death. *Halprin v. State*, 170 S.W.3d 111, 113 (Tex. Crim. App. 2005).

While Halprin's direct appeal was pending, he filed an application for writ of habeas corpus in this Court. This Court entered findings of fact and conclusions of law and recommended that habeas relief be denied. The Court of Criminal Appeals

adopted this Court's findings and conclusions (with some limited exceptions) and denied habeas relief on March 20, 2013. *Ex parte Halprin*, WR-77,175-01, 2013 WL 1150018, at *1 (Tex. Crim. App. Mar. 20, 2013) (not designated for publication).

Halprin then filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Texas, which denied relief on September 27, 2017. *Halprin v. Davis*, Civ. A. No. 3:13-CV-1535-L, 2017 WL 4286042, at *1 (N.D. Tex. Sept. 27, 2017). The Fifth Circuit Court of Appeals affirmed and denied a certificate of appealability on December 17, 2018. *Halprin v. Davis*, 911 F.3d 247, 252 (5th Cir. 2018). To date, Halprin has not filed a petition for writ of certiorari from that decision.

In the interim, however, Halprin filed a second petition for writ of habeas corpus in the U.S. District Court for the Northern District of Texas, and later still, Halprin filed a motion to stay and abate the proceedings related to his second federal petition.

## Request

The State respectfully requests that this Court issue an order setting Halprin for execution on Thursday, October 10, 2019. *See generally* Tex. Code Crim. Proc. art. 43.141. Under Texas law, Halprin's execution may not be set earlier than 91 days after the date this Court enters the order setting the execution date. *See id.* art. 43.141(c). As of the date the State makes this request, the proposed execution date

is 126 days away. This proposed execution date, then, accommodates the 91-day rule and allows Halprin a reasonable amount of time to investigate or litigate potential claims.

In a prior filing, the State indicated that "the State has informed Halprin's counsel, Timothy Gumkowski, of this potential execution date, and Mr. Gumkowski has expressed no scheduling conflicts specific to the date." However, in opposition to the State's original motion, Halprin attached an email that he sent to the undersigned counsel. That email was possibly deleted or misfiled in error, because it appears nowhere in the undersigned counsel's email inbox. As a result, the undersigned counsel retracts the statement quoted above. Nevertheless, there being no stays in effect, there is no legal reason why the Court of Criminal Appeals's mandate should not be observed.

## Conclusion

The State respectfully requests that this Court issue an order setting Halprin for execution on Thursday, October 10, 2019.

Respectfully submitted,

JOHN CREUZOT
Criminal District Attorney
Dallas County, Texas

BRIAN P. HIGGINBOTHAM
Assistant Criminal District Attorney
State Bar No. 24078665
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3625 | (214) 653-3643 fax
brian.higginbotham@dallascounty.org

## Certificate of Service

I certify that a true copy of this document was served on Tivon Schardl (tivon_schardl@fd.org), Timothy Gumkowski (tim_gumkowski@fd.org), and Paul Mansur (paul@paulmansurlaw.com) as counsel for Randy Ethan Halprin. Service was made via electronic service to on June 6, 2019.

Brian P. Higginbotham